*E-Filed 3/1/12*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ARMANDO RODRIGUEZ,

        Plaintiff,

    v.

BARRITA, INC., dba LA VICTORIA
TAQUERIA; NICANDRO BARRITA;
ENS ASSOCIATES INVESTMENTS,
LLC; MASOUD SHAHIDI; NICANDRO
BARRITA; and DOES 1 through 10,
inclusive,

        Defendants.

_____/

No. C 09-04057 RS

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT, DENYING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, AND
GRANTING DEFEDANTS' MOTION
FOR LEAVE TO AMEND**

## I. INTRODUCTION

Plaintiff Armando Rodriguez filed this action alleging violations of state and federal law in which he seeks damages and the removal of architectural barriers to accessability at La Victoria Taqueria in San Jose, California. The parties have submitted cross motions for partial summary judgment. Rodriguez moves for partial summary judgment on his claims under Title III of the Americans with Disabilities Act (ADA), and California's Unruh Act and Disabled Persons Act (CDPA). Defendants seek judgment on Rodriguez's claim for relief under the ADA, and on the personal liability of defendants Nicandro Barrita and Masoud Shahidi. Defendants also separately move for leave to file an amended answer to add the affirmative defense that removal of the barriers is not "readily achievable" under the ADA. Upon consideration of the parties' briefs, the arguments raised at the hearing, and for the reasons stated below, both parties' motions for partial summary judgment are denied, and the defendants' motion for leave to file an amended answer is granted.

United States District Court
For the Northern District of California

## II. FACTUAL BACKGROUND

Plaintiff Armando Rodriguez, who is physically disabled and uses a wheelchair, visited La Victoria Taqueria in November of 2008 and was unable to enter the restaurant due to architectural barriers to access at the front entrance in the form of stairs, and no ramp.  A family member accompanying him entered the restaurant, and upon returning, informed him that he would not be able to access the building, including the bathroom.  As a result, Rodriguez left, unable to eat at the restaurant and very upset.

Defendant Nicandro Barrita is the president of Barrita, Inc., and the sole proprietor of La Victoria.  He entered into a lease agreement, in his individual capacity, to operate the restaurant at its present location in 1998.  Since then, Barrita has opened four other restaurants under the same name.  In 2008, Barrita, Inc. assumed the lease to the subject property.  Barrita, Inc. has no by-laws, no directors, and holds occasional meetings at which no minutes are kept.  Also significantly, Barrita used funds from Barrita, Inc. to purchase residential property in which his mother currently resides.

Defendant Masoud Shahidi purchased the building which houses the original La Victoria in 1999, and in 2005, transferred ownership to defendant ENS Associates Investments, a real estate investment company, operated by Shahidi and owned by himself and one other individual in equal shares.  ENS has never been profitable and Shahidi has invested personal finances to cover expenses, including approximately $35,000 in 2010.  ENS has no employees, and while corporate meetings are sometimes held, the minutes are not recorded.

The building was constructed in 1908 as a two-story rental residence.  It remained a residence until, in 1985, the prior owners applied for, and received, a municipal permit to change its occupancy to a deli and office space.  In 1986, the owners remodeled the interior of the building for those purposes, and in doing so created at least some of the barriers to restroom access challenged in this action.  The second floor, which is not open to the public, consists of office space and a private dining room.  Today, on the first floor, there is a dining area located toward the front of the building, a restroom, and a kitchen in the rear.  The building occupies virtually the entire property lot, and the stairs which provide access to the building's first floor, which rise approximately five feet above

street level, spring vertically from the property line abutting the sidewalk in front of the building. Defendants admit that the restaurant entrance is not accessible to wheelchair users, including plaintiff, due to these stairs.  According to Rodriguez, inside the restaurant, there are additional barriers to access.  Allegedly, the counter is too high to serve disabled customers, and various features of the restroom's design do not comply with state and federal accessability requirements. Defendants do not contest the architectural measurements Rodriguez's expert has submitted pursuant to a site inspection.  However, it is undisputed that members of the public are barred from the kitchen.  Defendants also contend that the restroom is for employees' use only.  However, plaintiff's experts and investigators have conclusively documented visits to La Victoria on at least four separate occasions in the fall of 2011, during which they were either granted permission to use the restroom by employees or simply walked into it.  In addition, at the time plaintiff visited La Victoria in November of 2008, the restroom was unquestionably open to the public.

Before La Victoria first opened, Barrita made superficial and decorative changes to the interior, including painting.  No other work was done on the property until 2007, when a grease fire broke out in the kitchen, ultimately requiring repair work costing the defendants' insurer $100,000. The parties debate the extent of the repairs.  According to defendants, the fire damage was limited to the stove, the hood, and the flue to the roof, and the repair work was directed exclusively to these elements of the building.  Defendants admit that repairs to the stove necessitated "access work" to the floor, walls (including the sheetrock), and the roof immediately around the stove and vent, but maintain that "these areas were only touched to permit access to the stove and its components." Pl.'s Mot. For Summ. J., 5:7-10.  Plaintiff, relying on statements by defendants, and a contractor's bid that was submitted to the City of San Jose with an application for a construction permit to cover the repairs, contends that defendants made "alterations" to structural elements of the building.  Since the repairs were completed there has been no construction on the building.

Rodriguez filed this action on September 1, 2009.  The complaint advances claims for relief under: (1) California Health & Safety Code § 19955 and California Civil Code § 54, (2) California's Unruh Act, California Civil Code §§ 51-52, and (3) the federal ADA, 42 U.S.C. § 12101.  Plaintiff

United States District Court
For the Northern District of California

1  seeks injunctive relief, in the form of full and equal access, damages, as well as treble damages

2  under the CDPA, California Civil Code §§ 54, 54.1, and 54.3, and attorneys' fees and costs.

3  ## III. LEGAL STANDARD

4  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

5  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

6  any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

7  Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine

8  issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant succeeds,

9  the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a

10 genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Celotex*, 477 U.S. at 323. A genuine issue

11 of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which

12 could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).

13 The Court must view the evidence in the light most favorable to the nonmoving party and draw all

14 justifiable inferences in its favor. *Id.* at 255.

15 ## IV. DISCUSSION

16 ### A. Liability under the ADA

17 The parties have filed cross motions summary judgment on plaintiff's ADA claim. Congress

18 passed the ADA "to provide clear, strong, consistent, enforceable standards addressing

19 discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Title III prohibits

20 discrimination against disabled individuals by public accommodations. *Id.* at § 12182(a). Public

21 accommodations include restaurants. *Id.* at § 12181(7). However, the law also recognizes that in

22 "'mixed-use' facilities, where only part of the facility is open to the public, the portion that is closed

23 to the public is not a place of public accommodation and thus is not subject to Title III of the ADA."

24 *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008). *Accord Jankey v. Twentieth Century*

25 *Fox Film Corp.*, 14 F. Supp. 2d 1174, 1179 (C.D. Cal. 1998) (citing *Independent Living Resources*

26 *v. Oregon Arena Corp.,* 982 F. Supp. 698, 758–760 (D. Or. 1997)), *and Louie v. Ideal Cleaners*, No.

27 99-1557, 1999 WL 1269191, at *1-2 (N.D. Cal. Dec. 14, 1999). Administrative regulations

28 promulgated by the Department of Justice (DOJ) are in accord. *See* Preamble to Regulation on

United States District Court
For the Northern District of California

1   Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial

2   Facilities, 28 C.F.R. Pt. 36, App. B, 708 (July 26, 1991) ("a company that operates a place of public

3   accommodation is subject to [Title III] only in the operation of that place of public

4   accommodation"). For example, "the wholesale produce company that operates a road side stand

5   would be a public accommodation only for the purposes of the operation of that stand." *Id.* Thus,

6   although La Victoria is undoubtedly a place of public accommodation, and therefore subject to Title

7   III, the kitchen and the second floor are not, because access to those areas is indisputably closed to

8   the general public. [1]  The restroom on the first floor, on the other hand, is a place of public

9   accommodation because it was open to the public at the time that plaintiff visited La Victoria in

10  November of 2008.[2]

11       To recover on a claim for discrimination, plaintiff must prove (1) he is disabled within the

12  meaning of the ADA, (2) defendants are private entities that own, lease (or lease to), or operate a

13  place of public accommodation, and (3) the plaintiff was denied public accommodations by the

14  defendant because of his disability. *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*,

15  603 F.3d 666, 670 (9th Cir. 2010). Here, there is no dispute as to the first two elements of this test;

16  both are met. The parties focus, instead, on whether plaintiff suffered discrimination within the

17  meaning of the statute. He argues that the 2007 repairs constituted an "alteration" that triggered

18  defendants' obligation to remediate all access barriers within the building. Defendants counter that

19  no alteration was made, or at least, none to the facility's public areas sufficient to support an

20  obligation to make the entire building accessible. Instead, defendants urge that remediation is not

21  "readily achievable" under the circumstances.

22       1. Age & alteration

23  ───────────────────────

24  [1] Of course, a facility or an area in a facility that does not qualify as a place of public
    accommodation may still be a "commercial facility," as defined by 28 C.F.R. § 36.104, subject to

25  other requirements. The provisions of the law applicable to commercial facilities, however, are not
    at issue here.

26  [2] Defendants appear to dispute whether Rodriguez, who learned second-hand that the restroom was
    inaccessible, has standing to pursue claims on the basis of those alleged architectural barriers.
    However, the deterrent effect of plaintiff's uncertainty about his ability to enjoy public

27  accommodations is sufficient to confer standing under the ADA. *Doran v. 7-Eleven*, Inc., 524 F.3d
    1034, 1042-44 (9th Cir. 2008) (plaintiff has standing where "the violations he *did* know about

28  deterred him from conducting further first-hand investigation of the store's accessibility" (emphasis
    in original)).

No. C 09-04057 RS
ORDER

The ADA's requirements depend, in the first instance, on the age and history of the facility housing a public accommodation.  Facilities built after January 26, 1993, are governed by § 12183(a)(1) of Title 42 and must meet certain criteria for new construction.  Here, there is no question that the building housing La Victoria is an "existing" facility under the law, by virtue of the fact that it was constructed prior to that date.  The law as applied to existing facilities depends, secondarily, on whether any "alterations" have occurred since the ADA came into effect, on January 26, 1992.  If an existing facility is, subsequent to that date, "altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility," then the altered portions of the facility must be "readily accessible to and useable by individuals with disabilities, including individuals who use wheelchairs."  42 U.S.C. § 12183(a)(2).  For existing facilities that have not undergone any relevant alterations since then, liability for discrimination may only attach for "a failure to remove architectural barriers … where such removal is readily achievable."  *Id.* at § 12182(b)(2)(A)(iv).  Therefore, a threshold issue is whether the 2007 repair work to the building subsequent to the grease fire may be considered an "alteration" for purposes of the statute.[3]  Because the kitchen and the second floor do not qualify as a place of public accommodation, to prevail, plaintiff must show not only that there were legally significant alterations, but also that they were so extensive as to encompass areas within the facility that are open to the general public.  Any alterations to the kitchen or the second floor that did not otherwise affect the public areas of the facility do not trigger Title III's requirements.  *See Doran*, 524 F.3d at 1048.

DOJ is charged with promulgating administrative regulations to implement Title III's public accommodation provisions (§ 12186(b)), rendering technical assistance letters explaining the law's requirements (§ 12206(c)), and enforcing it in court.  Accordingly, its views are due deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (DOJ's interpretation of ADA accorded due deference).  "Alteration" is defined by § 3.5 of the DOJ's ADA Architectural Guidelines (ADAAG), set forth in Appendix A to 28 C.F.R. § 36.402:

---

[3] Of course, the 1986 renovations do not qualify as "alterations" for purposes of triggering § 12183(a)(2) because they occurred prior to the law's effective date.

> An alteration is a change to a building or facility that affects or could affect the usability of the building or facility or part thereof.  Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, resurfacing of circulation paths or vehicular ways, changes or rearrangement in the structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

Defendants, invoking this definition, argue at the outset that there has been no "change… that affects or could affect the usability of the building."

Few courts in the Ninth Circuit have interpreted the meaning of the term "usability," however, the DOJ has stated that it "remains convinced that the [ADA] requires the concept of 'usability' to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities."  Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35581 (July 26, 1991).  Courts in other jurisdictions, and most notably the Third Circuit, have tended to take an expansive view of alterations that affect usability. *Disabled in Action of Penn. v. Southeastern Penn. Transp. Authority*, 635 F.3d 87, 91-94 (3d Cir. 2011) (under ADAAG guidelines, complete replacement of stairway or inoperative escalator is considered "remodeling, renovation, rehabilitation [or] reconstruction" that affects "usability," even absent "major structural alterations"); *Regents of Mercersburg College v. Republic Franklin Ins. Co.*, 458 F.3d 159, 162-64 (3d Cir. 2006) (repairs following "fire that caused extensive damage to the roof and fourth floor of the building, as well as smoke and water damage to the first, second, and third floors" constituted alteration); *Kinney v. Yerusalim*, 9 F.3d 1067, 1073 (3d Cir. 1993) ("if an alteration [such as resurfacing] renders a street more 'usable' to those presently using it, such increased utility must also be made fully accessible to the disabled through the installation of curb ramps").  In all cases, however, "alteration seems generally to exclude from 'alterations' those modifications that essentially preserve the status and condition of a facility, rather than rendering it materially 'new' in some sense."  *Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 370 (2d Cir. 2008).

Plaintiff relies on a technical assistance letter from the DOJ, issued in response to an inquiry from a constituent "preparing for reconstruction after a fire destroyed a portion of the interior of his

restaurant."  Exh. 3 to Pl.'s Mot. for Summ. J.  Although the letter does not reflect the level of damage suffered by the restaurant, it generally advises, "[r]econstruction after a fire is considered an alteration."  *Id.*  It clarifies further, "if the damage caused by the fire is minor and can be corrected by cleaning, re-painting, or re-wallpapering, the ADA would not apply.  If walls are being reconstructed or new toilet fixtures or other elements are provided, the ADA requirements would apply."  *Id.*  This assessment is generally consistent with the principle articulated in *Roberts*.

Here, however, the extent of the damage to areas of public accommodation is disputed. Defendants, invoking the definition of "alteration" under the ADAAG, argue that repairs to the stove and its components are simply "changes to mechanical and electrical systems" to non-public areas that do not "affect the usability of the building or facility."  *Id.*  Defendants characterize repair work to the structural elements such as the floor and walls surrounding the stove as "access work," and insist that no more was done than was necessary to repair and replace the stove.  *See also Roberts*, 542 F.3d at 370 (finding of alteration inappropriate if "modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty").  Plaintiff does not dispute that no walls were moved or that the kitchen's functionality remains unchanged. Invoking the technical assistance letter's instruction that "reconstruction" of walls constitutes alteration, however, Rodriguez notes that defendants have admitted dry wall replacement and roof repair was necessary.  In support of his position, plaintiff also points to a bid from a contractor that was submitted by defendants to the City of San Jose with an application for a permit to cover repairs.[4]  That bid reflects estimates that it would cost $1,351 to "repair walls & ceiling in kitchen"; $1,710 to "repair shaft enclosing grease duct"; $3,208 to "repair tile floor in kitchen"; $2,361 to "repair side of building & overhang[,] match paint & siding"; $1,475 to "repair walls & ceilings upstairs," and $1,055 to "repair roof and structure."  Ex. 3 to Adler Decl. in Supp. of Pl.'s Mot. for Summ. J. Rodriguez, relying on his expert, characterizes these repairs as "structural alteration," sufficient to trigger plaintiffs' obligations.[5]

---

[4] Defendants object that the bid has not been authenticated by plaintiff, however, defendants admitted in deposition testimony that the document was submitted to the City with their permit application.

[5] Plaintiff doubts the veracity of defendants' account of the repairs, alleging that defendants have lied to the City of San Jose to obtain building permits in the past.  He also unfairly attempts to

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Whether the repairs constitute alteration depends on the extent of the damage and the reconstruction necessary.  If, on the one hand, the repairs to the building's structural elements, such as the sheetrock, siding, and roof, were, as defendants claim, completely superficial, and all other work was undertaken simply to access and replace the stove and its components, then no alteration occurred.  This is true because, as the DOJ's guidance and the case law suggest, minor repairs to fire damage that do not alter the purpose or functionality of the facility's public areas cannot constitute "alteration."  On the other hand, if, as Rodriguez contends, defendants reconstructed walls, and floors, and other structural elements of the building, thereby not just restoring, but in some way renewing and improving areas in the facility that are open to the public, a legally significant alteration may have occurred.  On the present record, defendants certainly cannot prevail in light of the documentary evidence indicating that repairs were somewhat more extensive than they admit.  Likewise, Rodriguez has not conclusively shown an alteration given that the defendants, who have first-hand knowledge of the changes, deny that they were as extensive as he claims.  Because deciding the issue would require the Court to make a factual finding that is subject to dispute, neither party is entitled to summary judgment on this question.

2. Primary function area

On the assumption that he prevails on the previous question, Rodriguez goes on to argue that not only were the repairs "alterations" under the ADA, they were alterations to a "primary function area."  A primary function is any "major activity for which the facility is intended."  28 C.F.R. § 36.403(b).  Section 36.403(a)(1) provides, "[a]ny alteration that affects or could affect the usability of or access to an area of a facility that contains a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms … serving the altered area, are readily accessible … unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration."  On the basis of the 2007 repairs, Rodriguez argues defendants were further obligated to remediate barriers to access in the bathroom and the path of travel.

impugn defendants on the basis of past convictions.  Those are irrelevant and not considered here. Likewise, legal conclusions offered by the parties' experts are afforded no weight.

No. C 09-04057 RS
ORDER

United States District Court
For the Northern District of California

Defendants, on the other hand, contend that the kitchen cannot be a primary function area because it is not open to the public.  Recognizing that a restaurant's kitchen is ordinarily not a place of public accommodation by virtue of that fact, some legal authority nonetheless suggests that "employee work areas" in places of public accommodation may be considered primary function areas.  The DOJ's administrative regulations state:

> Areas that contain a primary function include, but are not limited to, the customer services lobby of a bank, the dining area of a cafeteria, the meeting rooms in a conference center, as well as offices and *other work areas* in which the activities of the public accommodation or other private entity using the facility are carried out. Mechanical rooms, boiler rooms, supply storage rooms, employee lounges or locker rooms, janitorial closets, entrances, corridors, and restrooms are not areas containing a primary function.

28 C.F.R. § 36.403(b) (emphasis added).  From the suggestion that "the dining room area of a cafeteria" is a primary function area, defendants draw the negative inference that the kitchen serving the cafeteria must not be.  However, as plaintiff notes, § 36.403(c) lists both "employee work areas in a department store" and "employee work areas of a bank" as examples of primary function areas.

Tension arises between this seemingly broad definition of primary function area and the Ninth Circuit's holding (and DOJ's acknowledgment) that portions of mixed-use facilities closed to the public, such as employees-only restrooms, do not constitute places of accommodation subject to Title III.  *Doran*, 524 F.3d at 1048; 28 C.F.R. Pt. 36, App. B, 708 ("a company that operates a place of public accommodation is subject to [Title III] only in the operation of that place of public accommodation").  Although both parties invoke *Coalition of Montanans Concerned with Disabilities, Inc. v. Gallatin Airport Authority*, one of the few published opinions in this Circuit to address the meaning of primary function area, that case is of limited assistance.  957 F. Supp. 1166 (D. Mont. 1997).  The district court there concluded, "An airport restaurant meets the definition of 'primary function.'"  957 F. Supp. at 1171.  Defendants interpret its holding that "[t]he definition of 'primary function' includes all public areas of a building where business is conducted," to mean that only public areas can qualify.  957 F. Supp. at 1171.  However, the opinion also expressly recognizes that the term "includes both the customer services areas and work areas in places of

1  public accommodation."  *Id.* at 1170 (quoting DOJ, Title III Technical Assistance Manual Covering

2  Public Accommodations and Commercial Facilites, III-6.2000).

3       Rodriguez notes that La Victoria closed as a result of the fire, and argues, quite sensibly, that

4  food preparation is a "major activity for which the facility is intended."  He then goes on to argue

5  that an "employee work area" in a place of public accommodation qualifies as a primary function

6  area.  For Rodriguez to prevail his position must comport with the Ninth Circuit's definition of place

7  of public accommodation, set forth in *Doran*, which excludes those areas that are "closed to the

8  public."  524 F.3d at 1048.  Although he emphasizes that the definition of alteration refers to "*any*

9  change to a place of public accommodation or commercial facility," without limitation, he cannot

10  escape the fact that the kitchen is not open to the public.  Pl.'s Opp'n to Defs.' Mot. for Summ. J.,

11  6:1-2 (quoting § 36.402(a)(1)).  Ultimately, nothing in the administrative materials or the case law

12  suggests that an employee work area which is closed to the public – and thus not a place of public

13  accommodation – may nonetheless qualify as a primary use area.  To the contrary, the definitions

14  advanced, and the examples provided, specify that only "employee work areas *in places of public*

15  *accommodation*" can qualify.  Therefore, La Victoria's employees-only kitchen is not itself a

16  primary use area.

17       Whether there was an alteration to a primary use area, however, still depends in part on the

18  extent of the changes effected by the 2007 repairs, which is a disputed question of fact.  To the

19  extent the fact finder establishes that the repair work was limited to the kitchen area and the second

20  floor, defendants are under no obligation, as a matter of law, "to ensure that, to the maximum extent

21  feasible, the path of travel to the altered area and the restrooms" were readily accessible to the

22  plaintiff.  28 C.F.R. § 36.403(b).  On the other hand, if the finder of fact were to determine that the

23  repairs were so extensive as to alter areas of the building that do qualify as places of public

24  accommodation, then defendants would be obligated to remediate the restroom and pathway

25  barriers.  *Id.*

26       Finally, although defendants generally argue that the remedial measures sought by

27  Rodriguez are disproportionately costly, compared to the repair work following the 2007 fire, they

28  do not develop this argument pursuant to § 36.403(a)(1).  That section instructs that the "cost and

1    scope" of any required remediation to restroom facilities and the path of travel should not be

2    "disproportionate to the cost of the overall alteration [to the primary use area]." § 36.403(a)(1).

3    Given that the argument was not raised, and disputed questions of fact remain about the existence

4    and extent of any alteration, the issue of proportionality does not require any further discussion in

5    the context of these motions.

6         3. "Readily achievable" remediation

7         Even absent alteration, defendants, as owners and operators of an existing facility,

8    remain under a general, ongoing obligation to remove architectural barriers unless removal is

9    not "readily achievable."  *See* 42 U.S.C. §§ 12182(a), 12182(b)(2)(A).  As the statute makes

10   clear, that standard encompasses a number of context-specific considerations:

11        The term "readily achievable" means easily accomplishable and able to be carried out
          without much difficulty or expense. In determining whether an action is readily
12        achievable, factors to be considered include--
13            (A) the nature and cost of the action needed under this chapter;
              (B) the overall financial resources of the facility or facilities involved in the
14            action; the number of persons employed at such facility; the effect on
              expenses and resources, or the impact otherwise of such action upon the
15            operation of the facility;
              (C) the overall financial resources of the covered entity; the overall size of the
16            business of a covered entity with respect to the number of its employees; the
              number, type, and location of its facilities; and
17            (D) the type of operation or operations of the covered entity, including the
18            composition, structure, and functions of the workforce of such entity; the
              geographic separateness, administrative or fiscal relationship of the facility or
19            facilities in question to the covered entity.

20   *Id.* at § 12181(9).  Several courts have noted "[w]hether a specific change is readily achievable 'is a

21   fact-intensive inquiry that will rarely be decided on summary judgment.'"  *McIver v. Cal.*

22   *Exposition and Fair*, No. 01-1967, 2005 WL 1541087, at *1 (E.D. Cal. June 28, 2005) (quoting

23   *D'Lil v. Stardust Vacation Club,* No. 00-1496, 2001 WL 1825832, at *4 (E.D. Cal. Dec. 21, 2001)).

24   The parties have filed cross motions for summary judgment on this issue, with plaintiff attacking

25   defendants' position that remediation is not readily achievable as both procedurally and

26   substantively defective.

27        a. Leave to amend

28

No. C 09-04057 RS
ORDER

United States District Court
For the Northern District of California

Before reaching the merits, Rodriguez maintains defendants have waived their right to argue that remediation is not readily achievable by failing to include it in their original answer. He characterizes the doctrine as an affirmative defense that may be waived if it is not raised in an answer, and opposes defendants' motion for leave to amend for that purpose. For the reasons explained below, however, even assuming that it is an affirmative defense, defendants must be granted leave to amend.

Under Federal Rule of Civil Procedure 15(a)(2), the court should freely grant leave to amend "when justice so requires." The standard is one of "extreme liberality." *DCD Programs v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). In determining whether leave to amend is warranted, courts consider five factors: (1) undue delay; (2) bad faith; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether previously allowed amendments have failed to cure deficiencies. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Prejudice is the 'touchstone of the inquiry under rule 15(a).'" *Id.* (citing *Lone Star Ladies Inv. Club v. Schlotzky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Id.*

Here, defendants filed separate answers shortly after the complaint was filed. Both answers generally denied the complaint's allegation that removal of the barriers was "readily achievable" under the ADA, however, neither expressly raised that affirmative defense. Additionally, defendants failed to disclose a factual basis for the defense in their initial disclosures under Federal Rule of Civil Procedure 26, as General Order 56 suggests they must. Northern District of California General Order 56 (2009), ¶ 4. Instead, defendants' expert report, which was produced on June 28, 2011, stated that remediation was not readily achievable due to the relatively high cost of construction and the historic nature of the building. As plaintiff has previously conceded, defendants' counsel on an informal basis "repeatedly represented to plaintiff's counsel that defendants will rely on the readily achievable defense at summary judgment and trial." Pl.'s Opp'n to Def.'s Mot. for Protective Order, 5:20-22. In the course of discovery, Rodriguez's counsel also questioned individual defendants and the entity defendants' representatives about their financial

resources, propounded requests for production of documents, and successfully moved to compel

production of defendants' corporate and individual tax returns.  Nonetheless, he now argues that he

will suffer prejudice under Rule 15(a) if defendants are permitted to amend their answer because, he

claims, he was denied adequate opportunities to conduct discovery on defendants' finances and to

prepare a dispositive motion.

The parties dispute when, precisely, plaintiff learned of defendants' intention to defend on

this ground.  Although Rodriguez contends that defendants neglected to plead the defense as

General Order 56 suggests they must, and further, failed to give any notice of the "readily

achievable" defense until they were deposed by his counsel in August of 2011, defendants did raise

the defense in their expert report, which was produced to plaintiff on June 28, 2011.  That report

specifically finds, with respect to "the front entry and the toilet rooms," it is not "readily achievable

to incorporate accessible features due to cost, structural infeasibility, age and size of the building,

impact of the operation of the facility, the unique characteristics of property, and historical

significance."  Ex. 2 to McGuinness Decl. in Supp. of Pl.'s Opp'n to Defs.' Mot. to Amend.

Accordingly, by inference at least, Rodriguez had notice of defendants' intended position

approximately three months before the close of discovery.  Three months is ample time to initiate

discovery, which plaintiff's counsel did in fact, in the form of depositions and Requests for

Production of documents, pertaining to defendants' finances.  Although Rodriguez contends he was

not able to "follow up" on the discovery he did obtain, it is evident that there was plenty of time to

do so, and in any case, such a missed opportunity is not adequate grounds for a finding of prejudice.

To the extent Rodriguez argues defendants should have voluntarily disclosed their finances at an

earlier date, he is on even shakier ground.  Plaintiff already litigated a motion to compel, and that

matter was resolved largely in his favor.  *See* Order Granting in Part Defendants' Motion for

Protective Order and Granting in Part Plaintiff's Motion to Compel, Nov. 21, 2011 (Dkt. No. 105).

As a result, he has not suffered prejudice.

Rodriguez's further argument that he was not afforded sufficient time to prepare for this

round of motions, or even for trial, fails for similar reasons.  First, he had sufficient time to prepare,

given that he was put on notice of defendants' position six months ago, and reminded repeatedly

No. C 09-04057 RS
ORDER

14

thereafter by defendants' counsel.  Second, the Court granted plaintiff's motion for a continuance of the hearing on the instant motions and an extension of time to respond to defendants' motion for summary judgment – precisely so that he could review defendants' recently-produced financial records and prepare the current motion.  *See* Order Extending Time for Filing Opposition to Summary Judgment Motion and Continuing Hearing, Nov. 28, 2011, Dkt. No. 109.  Again, no prejudice has befallen him.

Finally, plaintiff's contention that defendants waived the "readily achievable" defense by failing to include it in their answer is unpersuasive.  The case on which Rodriguez relies, *Wilson v. Haria & Gorgi Corp.*, 479 F. Supp. 2d 1127, 1133 n.7 (E.D. Cal. 2007), warrants no different conclusion.  That decision rests on an earlier opinion in *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 819 (9th Cir. 2004), to support its holding that defendant had waived the "readily achievable" defense at summary judgment by failing to plead it in its answer.  Yet *Enlow* held only that because defendant did not specifically plead the affirmative defense at summary judgment, it was "effectively waived."  *Id.*  Moreover, in apparent contradiction to *Wilson*, the Ninth Circuit has elsewhere instructed that: "We have liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings. However, defendants may raise an affirmative defense for the first time in a motion for summary judgment only if the delay does not prejudice the plaintiff."  *Magana v. Com. of the Northern Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997) (citing *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984)).  As applied here, *Magana* suggests that defendants' must be granted leave to amend because plaintiff has not suffered any prejudice.  Accordingly, defendants' motion to amend is granted.

### b. Merits

Turning to the merits of whether or not remediation is "readily achievable," the parties disagree as to who bears the burden of establishing the applicability of the doctrine.  Although the Ninth Circuit has not determined who bears the burden of proof in showing that, as alleged here, removal of an architectural barrier is readily achievable due to cost, it has recently held that the initial burden of production rests with defendant where it is asserted that remediation is not readily achievable due to the historic nature of the facility.  *Molski v. Foley Estates Vineyard and Winery,*

1    *LLC*, 531 F.3d 1043, 1048 (9th Cir. 2008).  Although many other jurisdictions have adopted a

2    burden shifting scheme, wherein plaintiff retains the initial burden of production, with defendants

3    obliged to carry the ultimate burden of persuasion, the panel in *Foley Estates* specifically rejected

4    the district court's reliance on the Tenth Circuit's case that originated that approach.  *See Colo.*

5    *Cross Disability Coalition v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999, 1002-03 (10th Cir.

6    2001).  In so doing, the Ninth Circuit explained that the Tenth Circuit's opinion in *Colorado Cross*

7    neglected to consider ADAAG § 4.1.7, which suggests defendant ought to bear the burden of

8    production.  *Foley Estates*, 531 F.3d at 1048-49.  Specifically, the court noted that the language of §

9    4.1.7 requiring the party seeking to invoke the historical exception to consult with the State

10   Historical Preservation Officer, indicates that the burden of production should fall on defendant.  *Id.*

11   Consistent with this view, the *Foley Estates* panel also noted that defendant will ordinarily have the

12   best access to information concerning the facility's historical pedigree.  In conclusion, it noted that

13   such an approach comports with Congressional intent and reliance on private litigants to enforce the

14   ADA's provisions.  *Id.*

15          As defendant points out, at least one district court in the Ninth Circuit has continued to

16   follow *Colorado Cross* after *Foley Estates*.  *See Vesecky v. Garick, Inc.*, No. 07-1173, 2008 WL

17   4446714 (D. Ariz. Sept. 30, 2008).  That decision, however, is not consistent with the thrust of

18   *Foley Estates*, or the language of the statute itself, which also hints that it ultimately must fall to

19   defendants to establish the "readily achievable" exception.  *See* 42 U.S.C. § 12182(B)(2)(A)(v)

20   ("*where an entity can demonstrate* that removal of a barrier under clause (iv) is not readily

21   achievable…").  *Colo. Cross*, 264 F.3d at 1002 (acknowledging the same).  While it is true that

22   *Foley Estates* is, by its terms, limited to cases where the historical exception is asserted, its concerns

23   regarding the availability of evidence have equal weight when defendant claims that remediation

24   would be too costly or impractical.  Defendants will usually be better positioned to assess both the

25   special logistical difficulties posed by construction and, given their knowledge of their own

26   financial circumstances, the relative expense associated with it.  In this particular case, given

27   plaintiff's difficulty in obtaining full disclosure of defendants' financial records, that general

28   observation holds true.

United States District Court
For the Northern District of California

1    The conclusion that defendants ought to bear the burden fully comports, moreover, with

2    *Foley Estates*' recognition that Congress intended to rely on private litigants to enforce the ADA.

3    531 F.3d at 1049.  As the dissent in *Colorado Cross* pointed out, if a plaintiff must produce a pre-

4    approved construction contract and detailed plans, engineering studies, all necessary permits, as well

5    as a thorough accounting of *defendant's* finances, and projections of the anticipated expense on

6    future profits, all to dispatch his initial burden, few will ever succeed.  *Colo. Cross*, 264 F.3d at

7    1101 (Lucero, J., dissenting).  The law "need not require an ADA plaintiff to undertake such heroic

8    measures."  *Foley Estates*, 531 F.3d at 1049.  Instead, defendants must bear the initial burden of

9    production as well as the ultimate burden of persuasion in establishing that remediation is not

10   readily achievable.  Further, defendants must carry their burden with respect to each identified

11   barrier to access in the facility.

12                                          i. Entrance

13   Defendants advance three reasons why they believe the stairway cannot be remediated.  All

14   are predicated on their assumption that the appropriate remedy is to install a lift at the front entrance

15   of the building underneath a historic bay window.  First, they argue that it would take approximately

16   four years for them to design and construct such a lift.  Second, defendants argue that their plan will

17   require extensive façade reconstruction that renders the project not readily achievable.  Finally,

18   defendants argue that implementing their plan, which would cost at least $194,000, including

19   $35,000 for the lift alone, is too expensive to make it readily achievable and would likely force the

20   restaurant to relocate.[6]

21    To execute their remediation plan, defendants would need to: (1) engage an architect to

22   formulate a design that does not interfere with the building's historic façade, (2) submit and receive

23   approval for that design from the City of San Jose, including the Planning Department and the

24   Historic Landmarks Commission, (3) obtain bids from a contractor, (4) complete the necessary

25   _____

26   [6] The parties lodge extensive objections to the evidence offered by the other.  Plaintiff attacks the
     credentials of defendants' architectural expert, and the substance of her opinions and moves

27   separately for a *Daubert* hearing.  Defendants argue that because plaintiff failed to disclose the
     identity of its expert on defendants' finances, let alone a report of his proposed testimony, his

28   evaluation of the relative burden of remediation should be excluded.  Resolution of the instant
     motions does not require reliance on either expert's report, therefore both parties' objections are
     overruled as moot.

United States District Court
For the Northern District of California

1   construction, and (5) receive final approval from the San Jose Building Department.  Because

2   defendants' preferred plan would require approval from the Historic Landmarks Commission, they

3   insist an additional six months will be required to complete this step alone.  Defendants have filed a

4   detailed timeline in support of their allegation that the project would take as long as four years.

5   Rodriguez persuasively counters that bureaucratic delays incident to the permitting process

6   inevitably affect all similar construction work in a given jurisdiction, and therefore should not be

7   included when assessing the logistical difficulty and expense of remediation.

8          Rodriquez argues, additionally, that the four year estimate is an exaggeration because in

9   2011, defendants already applied for, and actually received in approximately one year, a permit for

10  plans that would remediate the inaccessible entrance.  Defendants are correct that evidence of their

11  previously permitted plans – which were obtained in a good faith attempt to settle this litigation –

12  are inadmissible under Federal Rule of Evidence 407 and may not be considered.  Fed. R. Evid. 407

13  (evidence of "subsequent remedial measures is not admissible" to prove "culpable conduct").

14         Ultimately, however, to carry their burden, defendants must explain why plaintiff's

15  alternative plan, which locates the lift on the side of the building, is also not readily achievable.

16  Attempting to dispatch this obligation, they argue that locating the lift on the side of the building

17  would require an easement from the adjacent property because there is inadequate space to locate it

18  within the property line, a position that plaintiff disputes.  Although defendants maintain that

19  obtaining such an easement would be fatal to ready achievement of the project, neither they, nor

20  plaintiff, offers any estimate of its cost.  It is obvious that disagreement persists regarding the value

21  of the easement because the parties dispute, additionally, the extent of incursion necessary to locate

22  the lift on the side of the building.  Rodriguez insists it is only a matter of a few feet, and any

23  easement would not diminish usage of the neighboring property; defendants point out that a right of

24  way would be required, in addition to the space necessary to support the lift, and suggests that the

25  easement would interfere with the provision of city services and the use of the driveway on the

26  neighboring lot.  The extent to which this alternative plan would alleviate the time and expense

27  necessary to remediate existing barriers thus remains a subject of dispute.  As a result, defendants

28  cannot obtain judgment as a matter of law that the necessity of an easement precludes ready

United States District Court
For the Northern District of California

1  achievement of any plan locating the lift on the side of the building.[7]  Nor can plaintiff establish that

2  he is entitled to summary judgment.

3        Even if defendants were to prevail on that issue, however, Rodriguez argues that defendants'

4  four year timeline overstates the duration of the process.  He notes that defendant Shahidi was able

5  to obtain a permit for installation of an exterior wheelchair lift on a nearby property he owns in

6  approximately one year.  Although the properties, and the permitting and construction issues raised

7  by Shahidi's prior project are obviously not identical to those presented here, plaintiff's experts

8  agree that the timeline envisioned by defendants and their expert is unrealistically protracted.

9  Defendants' expert avers that based on her experience, the permitting and construction *would* take

10  as long as four years.  Accordingly, disputed issues of fact remain on this question as well.  It

11  follows that neither party can prevail as a matter of law, at least at this stage, on whether

12  remediation would take so long as to fall within the category of not readily achievable.

13        Finally, significant factual questions concerning the cost of remediation, relative to

14  defendants' financial resources, remain subject to dispute by the parties.  Again, ultimately,

15  summary judgment is inappropriate given that neither party has attempted to estimate fully the cost

16  of placing the lift on the side of the building, including the expense associated with the easement.  A

17  review of the parties' briefs and the record indicates that many other contested factual issues

18  concerning cost also remain unresolved.[8]  Defendants argue, for example, that the complete cost for

19  the renovations they propose total $194,200, relying on the estimate of their expert.  Rodriguez

20  apparently does not dispute the proposition that remediation costing nearly $200,000 in total is not

21  readily achievable, given defendants' finances.  However, he offers conflicting evidence, largely in

22  the form of expert declarations, suggesting remediation would cost no more than approximately

23  $60,000 – around $25,000 to remove barriers from the restroom, and $36,000 to install the lift – if

24  his proposed plan were to be implemented, and insists that his evidence is simply more reliable.  In

25

26  [7] For this reason, defendants' cannot successfully maintain their second argument – that extensive reconstruction of the building's façade would be necessary to remove architectural barriers at the
27  entrance.  Although defendants are correct that the DOJ has advised "extensive restructuring" is not required "to remove barriers to access posed by a flight of steps," defendants have not yet shown
28  that such reconstructive work is absolutely necessary.  28 C.F.R. Pt. 36, App. B, at § 36.304.
   [8] Again, insofar as plaintiff seeks to use the estimate attached by defendants to their previous application for a permit, that evidence is likely inadmissible.  Fed. R. Evid. 407.

1    light of these patent factual disputes concerning cost, it is unnecessary to consider, in greater detail,

2    the further disagreement regarding defendants' financial circumstances.  Significant factual issues

3    relating to the underlying cost of permitting and construction remain disputed, and as a result

4    summary judgment is inappropriate.[9]

5                                  ii. Other architectural barriers

6           As for the architectural barriers found in the restroom, defendants primarily rely on their

7    allegation that they no longer permit the public to use the restroom, thereby exempting it from Title

8    III of the ADA.  *Doran*, 524 F.3d at 1048 (employees-only restroom not covered by Title III).  In

9    that the restroom was open to the public at the time Rodriguez visited, however, the issue remains in

10   dispute.  Moreover, the declarations and photographic evidence submitted by Rodriguez, suggesting

11   that the restroom is still open to the public, flatly contradict defendants' position.  Therefore, as an

12   initial matter, defendants have failed to establish that the restroom is not subject to Title III.[10]

13          Secondarily, defendants argue that removal of all interior barriers is unnecessary owing to

14   the non-readily achievable removal prospects for the barriers at the building's entrance.  Of course,

15   since defendants cannot establish that predicate as a matter of law, they cannot rely on that position

16   in defense of their failure to remediate the barriers elsewhere in the building.  Ultimately, it is

17   defendants' burden to show that they have satisfied their ongoing obligation to remove interior

18   architectural barriers where it is "readily achievable" to do so.  Because they have not produced

19   evidence to suggest that remediation of interior barriers, such as the high counter and improperly

20   placed grab bars, is not readily achievable, they have not carried their burden, and their motion for

21   summary judgment must be denied.

22          Rodriguez argues that even if removing the architectural barriers at the building's entrance is

23   not readily achievable, defendants are still obligated to remove all other barriers in the facility.  He

24   _____

25   [9] Although defendants contend La Victoria provides physically disabled customers with alternative
     access to its facilities, in the form of curb side service, pursuant to § 12182(b)(2)(a)(v) and §
26   36.305(a), it is unnecessary to address this contention because factual questions remain as to
     whether remediation is readily achievable.  The evidence mustered by the parties to date, however,
27   casts serious doubts on defendants' claim that they actually satisfy this requirement of the law by
     offering service to disabled patrons on the street.

28   [10] Rodriguez also notes that, to the extent defendants have sought to shirk their legal responsibilities
     under the ADA simply by closing the restroom to the public, they have likely violated state law.
     *See, e.g.,* California Health & Safety Code § 114276.

invokes *Foley Estates* for the proposition that an imperfectly accessible entranceway to a facility does not absolve defendant of any duty to remove interior architectural barriers. *See Foley Estates*, 531 F.3d at 1049. Indeed, in *Foley Estates*, the Ninth Circuit rejected the defendant winery's argument that it should be absolved of "its responsibility to remove interior barriers because the only existing ramp [at the entrance of the facility] is non-compliant." *Id.* Thus, defendants are under an ongoing duty to remediate interior barriers, regardless of whether or not they can feasibly install a lift to bypass the stairway at the front of the building.

Rodriguez insists that remediation of the service counter would cost approximately $3,500, with ADA restroom compliance an additional approximately $25,000, expenses that he alleges are well within defendants' means. Although defendants have lodged a number of objections to the evidence proffered by Rodriguez, including in particular those that relate to the recently permitted plans, they do not contest the cost and feasibility of the less significant remedial measures suggested by plaintiff, such as alteration of the service counter height, adjustment of the grab bars in the restroom, and the lowering of the mirror in the bathroom. At this time, given that remediation of the entryway has not yet been resolved, it would be inappropriate to grant summary judgment as to the interior barriers alone. Fed. R. Civ. P. 56(e)(4) (if a party fails to "properly address another party's assertion of fact" the court may, *inter alia*, "issue any other appropriate order"). Finally, as for the plans advanced by plaintiff's expert to eliminate the access barriers from the restroom, those appear to require alteration of the bathroom's floor plan, including relocation of its walls. *See* Ex. 1 to Adler Decl. in Supp. of Pl.'s Mot. for Summ. J. This would likely entail significant expense, and it is possible that such alterations exceed what is "readily achievable" under the law. Fed. R. Civ. P. 56(e)(4). Accordingly, both parties' motions for summary judgment on the issue of "readily achievable" remediation must be denied.

### 4. Personal liability

Defendants seek judgment as a matter of law that they have no individual liability under the ADA. Under 42 U.S.C. § 12182(a), liability for violations of the ADA extends to "any person who owns, leases (or leases to), or operates a place of public accommodation." There is no dispute that Barrita, Inc. leases the property from ENS, which owns it; neither Nicandro Barrita nor Shahidi

1   individually own or lease the property.  However, "operator" liability may nonetheless attach to one

2   who exercises the requisite authority.  As the Ninth Circuit has explained, "'to operate' means 'to

3   put or keep in operation,' 'to control or direct the functioning of,' or 'to conduct the affairs of; [to]

4   manage.'"  *Lentini v. Cal. Ctr. for the Arts, Escondido,* 370 F.3d 837, 849 (9th Cir. 2004).

5          Defendants admit that Shahidi is one of two partners of ENS, and that he controls the day-to-

6   day operations of the company owning the property in dispute.  It is also undisputed that Shahidi has

7   invested his own personal funds in ENS to cover operating expenses, and that he and his partner do

8   not observe formalities when holding board meetings, preferring instead to engage in casual

9   conversations about the state of ENS's affairs.  Likewise, Nicandro Barrita is the president, and one

10   of only two officers, of Barrita, Inc.  Defendants do not dispute that the company otherwise lacks an

11   independent board and by-laws, and that Barrita has used company funds to purchase assets,

12   including real property, enjoyed in his personal capacity by he and his family.  It follows that both

13   Shahidi and Barrita meet the definition set forth in *Lentini*.  Contrary to defendants' claims, it is not

14   necessary to apply an "alter ego" theory or to "pierce the corporate veil" to find that defendants are

15   operators due to the control they wield.  *Mayers v. Taylor*, No. 09-00790, 2009 WL 2423746, at *2

16   (N.D. Cal. Aug. 5, 2009) ("While Defendant relies on numerous cases involving the general law

17   regarding piercing the corporate veil, Plaintiffs are not attempting to pierce the corporate veil or

18   impose liability on a mere shareholder. Rather, they seek to hold Defendant liable as an operator"

19   under the ADA).

20          Defendants, invoking out-of-circuit case law, maintain that neither Shahidi nor Barrita can

21   be held personally liable as operators unless they possessed the power to control modifications to

22   the physical structure of the facility, including removal of architectural barriers.  *See Coddington v.*

23   *Adelphi Univ.*, 45 F. Supp. 2d 211, 215 (E.D.N.Y. 1999).  However, *Coddington* recognizes a

24   "control test" whereby "courts have been reluctant to hold individual employees who are not policy

25   makers liable under the ADA," but are willing to find liability where the individual exercises his

26   own discretion to perform potentially discriminatory acts rather than merely implementing

27   "institutional policies" or "the mandates of superiors."  *Id.* at 215.  This approach is, fundamentally,

28   no different than that advocated by the Ninth Circuit in *Lentini*, and under either, the result is the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   same.  Shahidi and Barrita can be held individually liable.  Although defendants insist that Shahidi

2   and Barrita, to the extent they wield discretion or control over the building at all, are acting only in

3   their official capacities, given that both occupy positions of virtually unfettered authority – Shahidi

4   as managing co-partner in ENS, and Barrita as owner and president of Barrita, Inc., respectively –

5   there can be little question that each are exercising their own discretion rather than merely

6   implementing institutional policies, or those of a superior.  Moreover, the record contains numerous

7   permit applications and related documents, signed by either Shahidi or Barrita, and submitted to the

8   City of San Jose for the purpose of making changes to the physical structure of the building.

9   Therefore neither individual defendant can credibly deny that it is within their power to exercise the

10  requisite control over the premises.  It follows that their motion for summary judgment on this issue

11  must be denied.

12  B. State law claims

13          Finally, Rodriguez seeks judgment as a matter of law on his claims for relief under the

14  Unruh Act, California Civil Code §§ 51-52, and CDPA, California Civil Code §§ 54, 54.1, and 54.3.

15  Because neither party is entitled to summary judgment under Rodriguez's ADA claims, those

16  cannot serve as predicate violations in support of liability.  Instead, plaintiff apparently seeks to

17  establish an independent basis for liability under state law.  Title 24 of the California Code of

18  Regulations, also known as the California Building Code, sets forth accessability requirements for

19  public accommodations.  *Moeller v. Taco Bell Corp.*, — F. Supp. 2d —, 2011 WL 4634250, at *14-

20  15 (N.D. Cal. Oct. 5, 2011).  A violation of the Title 24's standards violates both the Unruh Act and

21  the CDPA.  *Arnold v. United Artists Theater Circuit, Inc.,* 866 F. Supp. 433, 439 (N.D. Cal. 1994).

22  Title 24 requires that any "altered" portions of public accommodations, including entranceways,

23  paths of travel, and public restrooms, must be brought into compliance with the then-applicable

24  accessability standards.  Cal. Code Regs., tit. 24, § 2-105(b).  *Moeller*, 2011 WL 4634250, at *14-

25  15.  *See also* Cal. Health & Saf. Code § 19959.

26

27

28

United States District Court
For the Northern District of California

1    Here, it is undisputed that in 1985 the prior owners reclassified the building from a residence

2    to mixed office and restaurant space.[11]  Plaintiff asserts, and defendants do not contest, that at that

3    time a "change of occupancy" constituted an "alteration" for purposes of then-applicable

4    accessibility standards.[12]  Cal. Code Regs., tit. 24, § 2-402 (1979); Cal. Code Regs., tit. 24, § 2-

5    105(b)(11)(B) (1984).  Plaintiff maintains that the prior owner's interior remodel in 1986, and the

6    2007 repairs following the grease fire, were also sufficient to trigger an obligation to remediate,

7    notwithstanding the fact that the City of San Jose issued "unreasonable hardship" exceptions for

8    both of those projects.[13]

9    Defendants advance several arguments in opposition to summary judgment on plaintiff's

10   state law claims.  First, they reassert their position that the restroom is not a place of public of

11   accommodation because they have closed it to the public; for the reasons discussed above, that

12   argument is unavailing.  Second, they argue they should not be liable on the basis of the prior

13   owners' failure to meet existing accessibility guidelines, particularly given that the City of San Jose

14   granted an exception to the prior owners for the construction that occurred after the occupancy

15   change in 1986, and to defendants following the fire in 2007.

16   To prevail on his Unruh Act claim, Rodriguez "must plead and prove intentional

17   discrimination in public accommodations in violation of the terms of the Act."  *Munson v. Del Taco,*

18   *Inc.*, 46 Cal. 4th 661, 672, 690 (2009) (citing *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d

19   1142, 1175 (1991)).  The exception to this rule applies only where a plaintiff recovers under the

---

20   [11] Although defendants insist the permit records cited by Rodriguez as proof of the 1985 change of
     occupancy have not been authenticated, and that Rodriguez has failed to offer any other proof, they
21   do not deny that a change of occupancy occurred.  Moreover, they offer no reason to doubt the
     authenticity of the records maintained by the City of San Jose.
22   [12] Defendants maintain their expert "did not agree that a change of occupancy occurred in 1985 or
     1986," because she failed to examine any records from the applicable time period.  Defs.' Opp'n to
23   Pl.'s Mot. for Summ. J., 21: 6-15.  However, in her deposition, defendants' expert admitted in
     1985 California law applied, and further represented: "My understanding of the change of
24   occupancy was from residential to public accommodation, and therefore the requirement for an
     accessible entrance would have been required," and that "an accessible toilet was required."  Ex. 2
25   (Anderson Depo.) to McGuiness Decl. in Supp. of Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for
     Summ. J., at 256:25-257:18.
26   [13] Although Rodriguez insists that these exceptions were legally defective, *see* Cal. Health & Saf.
     Code § 19957 (allowing exceptions provided "equivalent facilities and protection"), and supported
27   by factual misrepresentations to the City, the circumstances under which those exceptions were
     granted are disputed.  It would be inappropriate at summary judgment to accept Rodriguez's view
28   that the exceptions were invalid, when the building's prior owners, defendants, and the City all
     apparently thought differently.

No. C 09-04057 RS
ORDER

24

United States District Court
For the Northern District of California

1   Unruh Act for underlying ADA violations.  *Id.*  *See also* Cal. Civ. Code 51(f) ("violation of the right

2   of any individual under the Americans with Disabilities Act of 1990 shall also constitute a violation

3   of this section").  Because the ADA itself contains no intent requirement, the California Supreme

4   Court has held that where it provides the basis for liability under the Unruh Act, no demonstration

5   of intentional discrimination is required to recover.  *Munson*, 46 Cal. 4th at 670.

6        Here, for the reasons discussed above, there has not yet been a predicate finding of liability

7   under the ADA.  As a result, the ADA-reliant cases Rodriguez invokes to suggest misleadingly that

8   no discriminatory intent (or as he puts it, "active participation") is necessary, are inapplicable.  *See,*

9   *e.g, Botosan v. Paul McNally Realty*, 216 F.3d 827 (9th Cir. 2000), *and Hodges v. El Torito Rests.,*

10  *Inc.*, No. 96–2242, 1998 WL 95398, at *3 (N.D. Cal. Feb. 23, 1998).  In fact, Rodriguez has not

11  expressly argued that defendants engaged in intentional discrimination in support of his motion for

12  summary judgment, and given the evidence concerning the facility's ownership history and the City

13  of San Jose's award of hardship exceptions in both 1986 and 2007, it is apparent that, at the very

14  least, serious factual questions remain concerning defendants' state of mind.  Summary judgment is

15  therefore denied on Rodriguez's claims under the Unruh Act.

16       Similar problems defeat his motion for summary judgment on the CDPA claim.  *See* Cal.

17  Civ. Code § 54.  Rodriguez need not prove intentional conduct to establish a violation of that law.

18  *Molski v. Arciero Wine Group*, 164 Cal. App. 4th 786, 792 (2008).  *Accord Donald v. Café Royale,*

19  *Inc.*, 218 Cal. App. 3d 168, 176 (1990).  The California Court of Appeals recognized in *Donald*,

20  however, that the "interpretation that section 54.3 contains no intent element does not preclude the

21  possibility that in some instances denial of access under the statute may be excused, e.g., where the

22  violator has been affirmatively directed, or given formal approval, by an enforcing agency to

23  construct premises in a certain way…."  *Donald*, 218 Cal. App. 3d at 180-181.  Recognizing that

24  informal representations by an unidentified employee of a municipal enforcement agency are plainly

25  insufficient to excuse non-compliance, *id.* at 181, here, defendants and their predecessors-in-interest

26  were in fact granted formal hardship exceptions by the City of San Jose, at least with respect to the

27  1986 and 2007 permits.  Plaintiff's CDPA claim therefore apparently hinges on defendants' legal

28  obligations flowing from the formal change of occupancy; however, the City granted an exception

for the remodel that actually converted the building from a residence to mixed commercial space. While plaintiff doubts the exception was properly supported, and speculates it was actually invalid, that issue is subject to dispute. As a consequence, the CDPA claim cannot be adjudicated without resolving outstanding factual questions, and the motion must be denied.

## V. CONCLUSION

For the reasons explained above, the parties' motions are resolved as follows:

(1) summary judgment is denied to both parties on plaintiff's claims for relief under the ADA;

(2) leave to amend is granted to defendants for the purpose of alleging that removal of existing architectural barriers is not readily achievable;

(3) summary judgment is denied to defendants on the issue of their individual liability; and

(4) summary judgment is denied to plaintiff on his claims for relief under the Unruh Act and the CDPA.

If defendants elect to file an amended answer, they must do within 21 days of this order.

IT IS SO ORDERED.

Dated: 2/29/12

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

No. C 09-04057 RS
ORDER

26