1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7           FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                   SAN FRANCISCO DIVISION

9

10 ARMANDO RODRIGUEZ,             No. C 09-04057 RS

           Plaintiff,

11                                  **FINDINGS OF FACT AND**

12    v.                             **CONCLUSIONS OF LAW**

13 BARRITA, INC., dba LA VICTORIA
TAQUERIA; NICANDRO BARRITA;

14 ENS ASSOCIATES INVESTMENTS,
LLC; MASOUD SHAHIDI; NICANDRO

15 BARRITA; and DOES 1 through 10,
inclusive,

16            Defendants.

17 _____/

18                **I.**     **INTRODUCTION**

19      In September 2009, plaintiff Armando Rodriguez, an individual who requires a wheelchair

20 for mobility, filed this action against defendants Barrita Inc., Nicandro Barrita, ENS Associates

21 Investments LLC, and Masoud Shahidi.  In his First Amended Complaint (FAC), Rodriguez alleges

22 that defendants violated the Americans with Disabilities Act of 1990 ("ADA"), the California

23 Disabled Persons Act, and the Unruh Act.  In particular, he claims defendants discriminated against

24 him by failing to remove architectural barriers to access at La Victoria Taqueria, a restaurant in San

25 Jose, California.  Rodriguez seeks injunctive relief, damages, and attorney fees and costs.

26      A bench trial was held in October 2013.  This order, which is based upon the evidence

27 presented at trial, the oral arguments of counsel, and the parties' briefs, comprises the findings of

28

United States District Court

For the Northern District of California

fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).[1]  As set forth below, Rodriguez prevails on some, but not all, of his allegations.  As an initial matter, several alleged barriers are not actionable.  Defendants are liable, however, with respect to all sixteen actionable barriers.  While some of these barriers violate both federal and California law, others violate only state law.

## II.    FINDINGS OF FACT

### A.  Parties

1.  Plaintiff Armando Rodriguez has been physically disabled since 2006, when a car accident left him paralyzed from the waist down.  Due to his paraplegia, Rodriguez uses a wheelchair for mobility.

2.  Defendant Barrita Inc., an entity incorporated in 2005, is the owner of the La Victoria Taqueria located at 140 East San Carlos Street in San Jose, California ("La Victoria" or "the restaurant").  It has two officers, including co-defendant Nicandro Barrita.[2]  Barrita Inc. does not have by-laws or an independent board.  It holds corporate meetings "as needed" every three or four months.  No notes or minutes are taken during those meetings.  At trial, Nicandro testified that Barrita Inc. has never issued stock, nor does it have any plans to do so.

3.  Defendant Nicandro Barrita is the president of Barrita Inc.  In 1998, before Barrita Inc. was formed, Nicandro signed a lease for the building that now houses La Victoria ("the building").  Barrita Inc. assumed the lease in 2008.  As president of Barrita Inc., Nicandro is a signatory on the lease for the corporation.

4.  Defendant Masoud Shahidi purchased the building in 1999.

5.  Defendant ENS Associates Investments LLC is a real estate investment company owned in equal shares by Masoud Shahidi and Hamid Emarlou.  ENS holds corporate meetings

---

[1] To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Tri-Tron International v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975).

[2] As there are both entities and persons bearing the Barrita name relevant to this action, to avoid confusion this order will refer to Nicandro Barrita by use of his first name.

**United States District Court**
For the Northern District of California

from time to time, but Shahidi and Emarlou do not keep minutes of the meetings.  ENS has owned the building since 2004, when Shahidi transferred ownership to ENS. Shahidi, who has invested his own personal funds in ENS, is the signatory on the lease between ENS and Barrita.

**B.  Non-Party Witnesses**

1.  Carlos Tovar is Rodriguez's brother-in-law.  He accompanied Rodriguez during his 2008 visit to La Victoria.

2.  Marcelino Barrita, Nicandro's father, works at La Victoria.  He was on the premises in 2007 when firefighters extinguished a fire that had started in the restaurant's kitchen. Following the fire, he oversaw repairs to the facility.

3.  Abdullah Mojaddidi is a wheelchair-bound individual with paraplegia.  He testified regarding his experiences as a disabled patron of La Victoria.

4.  Jonathan Adler, a general contractor and disability access consultant, testified as an expert for Rodriguez.

5.  Karl Danz, a contractor with experience designing and implementing disabled access construction projects, testified as an expert for Rodriguez.

6.  Dawn Anderson, an architect, testified as an expert for defendants.

**C.  Rodriguez's Visit to La Victoria**

1.  In November 2008, Rodriguez visited La Victoria after attending a doctor's appointment in San Jose.  Because Rodriguez was unable to operate a car at the time, his brother-in-law, Carlos Tovar, drove him.  At trial, Rodriguez testified that he wanted to visit La Victoria because he remembered enjoying the restaurant prior to his accident.

2.  When Rodriguez and Tovar pulled up to the restaurant, Rodriguez noticed that there was a stairway leading up to the front entrance.  He further observed that there was no lift or ramp for persons in wheelchairs.  Tovar went inside to see if there was an alternate entrance.  At trial, Tovar testified that he used La Victoria's restroom, which he observed to be too small for an individual in a wheelchair.

United States District Court

For the Northern District of California

3. Tovar returned to the car, where he informed Rodriguez that there was no alternate entrance. He also told Rodriguez that even if he could get inside, the restroom would be too small for him to use. Based on this information, Rodriguez decided to go home. He was deterred by the restaurant's barriers to access. Rodriguez persuasively testified that the experience made him feel sad, angry, and frustrated.

**D. The Subject Property**

1. The building was constructed in 1908 as a residence. It remained a residence until 1985, when the San Jose Building Department reclassified it as an office space.

2. The building was then remodeled in 1986. While the precise extent of the 1986 renovations is unknown, records maintained by the Building Department indicate that the building underwent significant modifications pursuant to the 1985 change in occupancy. Upon examining the records, plaintiff's expert Jonathan Adler opined that the first-floor restroom was altered, rendering it smaller. He also concluded that the kitchen was enlarged and converted into a commercial cooking space. Adler further opined that new stairs were added to the entrance of the building. The records also indicate that a single-story addition was constructed in the rear of the building. While the parties dispute the extent of the 1986 remodeling, experts for both plaintiff and defendants opined that some degree of alteration occurred in 1986.

3. Despite the 1985 change in occupancy and the 1986 remodeling, both of which Rodriguez contends triggered heightened accessibility obligations under California disability law, the building was not made accessible to persons in wheelchairs. According to San Jose Building Department records, the prior owners, citing unreasonable hardship, requested an exception from compliance with handicapped accessibility law. The City apparently granted the owners' request with respect to the 1985 change in occupancy and the 1986 remodeling.

4. Shahidi was unaware of the 1986 Department records until this lawsuit was filed. Similarly, Nicandro never made an attempt to discern if the restaurant was compliant with federal and state disability access obligations.

5. Nicandro testified that at least three different restaurants had operated within the building before La Victoria opened in 1998.

6. In 2007, a fire broke out in the La Victoria kitchen.  Defendants closed the restaurant to repair the resulting damage.  The repairs cost between $100,000 and $110,000.

7. The parties dispute the extent of the repairs.  Defendants contend the fire damage was limited to the kitchen, the second floor, and the duct leading to the roof.

8. According to defendants, the following repairs were made after the fire: repair to walls and ceiling in the kitchen; repair to the shaft enclosing the grease duct; repair to the kitchen's tile floor; repair to the side of the building and overhang; repair to the wall and ceiling in the basement, including a storage area; repair to the walls and ceiling in the second floor; and superficial repairs to the portion of the roof and building structure covering the duct and stove hood. Interior and exterior elements of the building were also painted to match repaired portions of walls and siding.  Most of these repairs, defendants assert, were undertaken to return the stove (including its hood and duct) to working condition.

9. Rodriguez contends that the post-fire repairs were more extensive than defendants are willing to admit.  In addition to the aforementioned repairs acknowledged by defendants, Rodriguez claims that a new full-height stud wall was installed to support the stove hood in the kitchen.  He also contends that a new stove hood was installed.   He further emphasizes the testimony of Marcelino Barrita, a percipient witness and father of Nicandro, who observed firefighters knocking down portions of second-floor stud walls encasing the hood duct.  Rodriguez contends that because stud walls were partially removed, the resulting repairs constituted significant reconstruction.

10. After the fire, citing unreasonable hardship, Barrita Inc. applied for a formal exception from disabled access requirements.  The City of San Jose Building Division granted the exception.  In its hardship application, Barrita Inc. represented that the total cost of repairs was only $6,269.  (Pl's Exh. 14).  This figure is significantly lower than the actual cost, which was somewhere between $100,000 and $110,000.  In a separate permit

**United States District Court**
For the Northern District of California

1    application, defendants represented to the City that the repairs only cost $40,118.

2    Furthermore, although Barrita Inc. represented in its hardship application that it would

3    conduct a number of access upgrades, it made no such improvements during the 2007

4    repairs.  Emphasizing these significant discrepancies, Rodriguez questions the credibility

5    of defendants' representations about the extent of the fire damage.

6   E.  **Barriers to Access**

7    1.  The parties stipulate that more than twenty distinct barriers to access existed at the time

8        of Rodriguez's 2008 visit to La Victoria.  (Pl's Exh. 56).  Many of the stipulated barriers

9        are alleged in Rodriguez's FAC.  Some, however, were not identified until April 2013,

10       when plaintiff's expert Jonathan Adler filed a supplemental expert report following an

11       on-site inspection of the premises.

12   2.  Adler's April 2013 report also purports to identify additional barriers that were created

13       by subsequent modifications to the subject property.  Rodriguez seeks to hold defendants

14       liable for these late-arising barriers, including insufficient disabled seating in the La

15       Victoria dining room and excessive ramping on the path below the entrance steps.

16   3.  The following barriers existed at the time of Rodriguez's 2008 visit and were properly

17       identified in Rodriguez's FAC:

18              a.  the restaurant had no accessible public entrance for wheelchair users,

19              b.  the stair risers were excessively high,

20              c.  the stair risers were not uniform,

21              d.  the stair handrails were incomplete,

22              e.  the stair handrails lacked sufficient gripping surface,

23              f.  the stairs lacked caution striping,

24              g.  the restroom lacked geometric signage,

25              h.  the restroom's tactile signage was improperly located,

26              i.  the restroom door threshold was raised too high,

27              j.  the restroom door was too narrow,

28

**United States District Court**
For the Northern District of California

k. there was not enough space for a wheelchair to turn around inside the restroom,

l. the restroom door lacked sufficient strike-edge clearance, thereby making it difficult for a wheelchair user to enter and exit the restroom,

m. the restroom lacked sufficient space for a wheelchair user to transfer himself or herself to the toilet,

n. the side grab bar was improperly located,

o. the lavatory counter surface was too high,

p. the mirror was too high,

q. the paper towel dispenser was too high,

r. the sink was too high,

s. the hot-water pipe beneath the sink was not insulated, thereby posing a burn threat to a wheelchair user, and

t. the dining room "order counter" was too high. *Id.*

4. Since Rodriguez's visit, several of the aforementioned barriers have been remediated. *Id.*

F. **Availability of Accessibility Improvements and Alternatives**

1. The interior structure of the building precludes defendants from bringing the restroom door into full compliance with federal and state accessibility standards. To make the restroom fully compliant, defendants would need to reconstruct a significant portion of the building.

2. Experts for both plaintiff and defendants testified that a power door opener is a potential solution to the strike-edge problems on the restroom door. Adler testified that when site conditions do not provide sufficient room to create strike-edge clearance in the doorway of an existing building, installing a power door opener is a preferred solution for disabled access.

3. Nicandro testified that installing a power door opener was "a possibility." Vol. III, 328:23.

4.  Plaintiff's experts provided several proposals for wheelchair lifts at the entrance of the building.  The first plan proposes an incline lift at the left side of the stairs ("Lift A").  The second plan proposes an incline lift at the right side of the stairs ("Lift B").  The third plan proposes a vertical platform lift situated at the right side of the building ("Lift C").  Defendants contend that all three lifts would require the closing of the restaurant during construction.  Danz, by contrast, testified that the restaurant could remain open for the installation of each lift.  He further opined that none of the proposals would require unusual or difficult construction work.

5.  <u>Lift A</u>**:** According to Danz, Lift A would take between seven and twelve days to construct, including permitting and inspection.  He further testified that ramping would need to be installed in order to allow a wheelchair user to access the lift's entrance.  After proceeding up the ramping to the lift's entrance, the wheelchair user would board the lift, which would proceed to turn around the base of the entrance steps and move at an incline up the stairway.  Adler testified that the stairs would require structural modifications to support the proposed lift.  Anderson testified that a concrete foundation would need to be poured and the stair wall reconstructed in order to provide adequate support.

6.  <u>Lift B</u>:  Like Lift A, Lift B would require structural support and alterations to the path of travel leading to the lift's entrance.  Danz testified that, as proposed, Lift B would extend at least twenty inches into the adjacent property when deployed.  It would also require an encroachment into the city sidewalk, which would need to be raised and altered.  Because both Lift A and Lift B would move at an incline up the steps, they would block some space for customer ingress and egress when deployed.  Testimony for experts for each side established that, for at least a brief period of time while deployed, an incline lift would provide fewer than thirty-six inches of stair width for patrons using the entrance steps.

7.  <u>Lift C</u>:  Unlike Lifts A and B, which would move at an incline along the entrance steps, Lift C would rise vertically up the right side of the building.  Due to its proposed location on the right side of the restaurant, Lift C could not fit within the subject property.

United States District Court

For the Northern District of California

Accordingly, it would require a several-foot easement from the adjacent property, which is also owned by ENS.  ENS granted such an easement after the commencement of this action.  Shahidi ultimately revoked the easement, claiming that the lift would interfere with the City's waste collection services.  Nicandro, too, testified that the lift would interfere with garbage collection.  Defendants, however, offered no corroborating evidence in support of this contention.  Like Lifts A and B, Lift C would require defendants to remediate an excessive slope on the path of travel to the lift's proposed entrance.

8.  Danz testified that, excluding additional costs for site work, a vertical incline lift would cost $36,400 to install.  His testimony further established that, depending on the location of the incline lift, the site work and other costs would add somewhere between $10,100 and $22,100 to the project.

9.  Defendants contend that La Victoria provides curbside take-out for disabled patrons.  Nicandro testified, however, that the policy is not advertised on the premises or on the restaurant's website.  Moreover, Abdullah Mojaddidi testified that he was unable to place a curbside take-out order during a 2007 visit to the restaurant.

10. While the building has many barriers to access, and while defendants were aware of the presence of those barriers, no admissible facts reflected that defendants intended to discriminate against Rodriguez or other individuals with disabilities.

### III.    CONCLUSIONS OF LAW

#### A. Legal Standards

##### i.    Title III of the Americans With Disabilities Act

Congress passed the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2).  Title III prohibits discrimination against disabled individuals by public accommodations. *Id.* at § 12182(a).  Although restaurants are places of public accommodation, *see id.* § 12181(7), the law also recognizes that in "'mixed-use' facilities, where only part of the facility is open to the public, the

United States District Court

For the Northern District of California

1    portion that is closed to the public is not a place of public accommodation and thus is not subject to

2    Title III of the ADA." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008).

3          To recover on a claim for discrimination under the ADA, a plaintiff must prove (1) he or she

4    is disabled within the meaning of the statute, (2) defendants are private entities that own, lease (or

5    lease to), or operate a place of public accommodation, and (3) the plaintiff was denied public

6    accommodations by the defendant because of his or her disability. *Arizona ex rel. Goddard v.*

7    *Harkins Amusement Enters., Inc.*, 603 F.3d 666, 670 (9th Cir. 2010).[3] The third element is satisfied

8    when there is a violation of applicable accessibility standards. *Chapman v. Pier 1 Imports (U.S.),*

9    *Inc.*, 631 F.3d 939, 945 (9th Cir. 2011). The Title III accessibility standards come in three broad

10    categories: the "new construction" provisions, which apply to public accommodations constructed

11    after January 26, 1992; the "alteration" provisions, which apply to post-January 26, 1992 alterations

12    to buildings that existed as of that date; and the "readily achievable" provisions, which apply to

13    unaltered portions of buildings constructed before January 26, 1992. *See Moeller v. Taco Bell*

14    *Corp.*, 816 F. Supp. 2d 831, 847 (N.D. Cal. 2011). Because the La Victoria building was

15    constructed long before January 26, 1992, rendering it an "existing" facility under the ADA, the

16    "new construction" provisions are inapplicable here.

17                    *a. "Alteration" Provisions*

18          The altered portion of any existing building altered after January 26, 1992 is required, "to the

19    maximum extent feasible," to be "readily accessible to and useable by" individuals with disabilities.

20    42 U.S.C. § 12183(a)(2). To satisfy this standard, alterations must comply with the ADA

21    Architectural Guidelines (ADAAG).[4] *See* 28 C.F.R. § 36.406. These guidelines, which are

22    promulgated by the Attorney General to carry out the provisions of the ADA, "lay out the technical

23    structural requirements of places of public accommodation." *Chapman*, 631 F.3d at 945.

24                    *b. "Readily Achievable" Provisions.*

25

26    [3] The first and second elements are not in dispute. Rodriguez is disabled within the meaning of the ADA. Defendants each own, operate, and/or lease a place of public accommodation.

27

28    [4] The ADAAG applied to the building during the 2007 fire repairs and during Rodriguez's 2008 visit. *See* 28 C.F.R. § 36.406. The Standards for Accessible Design (ADAS) govern alterations made after March 15, 2012. *Id.*

United States District Court
For the Northern District of California

1    The ADAAG addresses whether an architectural element prohibits full and equal access to

2 individuals with disabilities. *See Moeller*, 816 F. Supp. 2d at 848.   In existing but unaltered

3 buildings, architectural barriers must be removed where it is "readily achievable" to do so.  42

4 U.S.C. § 12182(b)(2)(A)(iv).  The removal of barriers is "readily achievable" when it is "easily

5 accomplishable and able to be carried out without much difficulty or expense." *Id.* § 12181(9).  If

6 an entity demonstrates that the removal of an architectural barrier is *not* readily achievable, it

7 nonetheless discriminates against persons with disabilities if it fails "to make such goods, services,

8 facilities, privileges, advantages, or accommodations available through alternative methods if such

9 methods are readily achievable." *Id.* § 12182(b)(2)(A)(v).

10              ii.       Unruh Act and California Disabled Persons Act

11    Long before Congress passed the ADA, California enacted several statutes to prohibit

12 disability discrimination at the state level. *See Jankey v. Song Koo Lee*, 290 P.3d 187, 194-95

13 (2012).  Two overlapping laws, the Unruh Civil Rights Act and the California Disabled Persons Act

14 (CDPA), are presently "the principal sources of state disability access protection." *Id.* at 195.  Both

15 statutes prohibit discrimination on the basis of disability "in the full and equal access to the services,

16 facilities, and advantages of public accommodation." *Moeller*, 816 F. Supp. 2d at 848.  Although

17 the Unruh Act and CDPA overlap substantially with the ADA, *see Munson v. Del Taco, Inc.*, 208

18 P.3d 623, 632 (2009), the California legislature has sought to afford disabled persons additional

19 protections and remedies not provided under federal law. *See Jankey*, 290 P.3d at 195 ("[S]hortly

20 after passage of the ADA, the Legislature amended the state's disability protections to strengthen

21 California law in areas where it is weaker than the ADA and to retain California law when it

22 provides more protection for individuals with disabilities than the ADA.") (quotation marks,

23 citations, and alterations omitted).  Unlike the ADA, which only provides for injunctive relief and

24 attorney fees, the CDPA and the Unruh Act allow plaintiffs to recover damages.  Cal. Civ. Code §§

25 52(a), 54.3.[5]  Moreover, because California disability access standards long predate the ADA and

26 ADAAG, the CDPA and the Unruh Act can sometimes operate to remedy barriers that would not

27 otherwise fall within the ambit of the ADA. *See Castaneda v. Burger King Corp.*, 264 F.R.D. 557,

28

---

[5] The CDPA also provides for injunctive relief and attorney fees.  Cal. Civ. Code § 55.

1   561 (N.D. Cal. 2009) ("It may be possible, however, for an accessibility barrier to violate the

2   California statutes without violating the ADA.").

3       There are several avenues by which a plaintiff can prevail on a disability discrimination

4   claim under the CDPA or the Unruh Act.  First, he or she can prove that defendants violated

5   California accessibility requirements.  Public accommodations constructed or altered after July 1,

6   1970, are subject to California Health & Safety Code and Government Code requirements for

7   disabled access.  *Moeller*, 816 F. Supp. 2d at 847.  Since 1981, Title 24 of the California Code of

8   Regulations, also known as the California Building Code, has set forth accessibility requirements for

9   public accommodations.  *Id.*  A violation of Title 24 standards constitutes a violation of both the

10  Unruh Act and the CDPA.  *See Arnold v. United Artists Theater Circuit, Inc.*, 866 F.Supp. 433, 439

11  (N.D. Cal. 1994).  To receive damages under the Unruh Act, however, the plaintiff also "must plead

12  and prove intentional discrimination in public accommodations in violation of the terms of the Act."

13  *Munson*, 208 P.3d at 690 (quotation marks and citation omitted).  The CDPA has no such

14  requirement.  *See* Cal. Civ. Code § 54.3.  If a plaintiff prevails on a damages claim under both

15  statutes, double recovery is not permitted.  *Munson*, 208 P.3d at 632.

16      A plaintiff can also prevail under these California statutes by proving that defendants

17  violated federal disability law.  *Moeller*, 816 F. Supp 2d at 848.  Following passage of the ADA, the

18  California legislature amended the CDPA and the Unruh Act to provide that a violation of the ADA

19  constitutes a violation of both state statutes.  *See id.*; Cal. Civ.Code §§ 51(f), 54(c).  Because the

20  ADA itself contains no intent requirement, the California Supreme Court has held that where an

21  Unruh Act claim is premised on a violation of the ADA, the plaintiff need not demonstrate

22  intentional discrimination to recover.  *Munson*, 208 P.3d 623.

23

24

25      **B.  Actionable Barriers**

26      As a threshold matter, the parties dispute which of the alleged barriers are actionable.

27  Defendants argue that Rodriguez lacks standing to challenge several barriers pertaining to the safety

28  of the restaurant's front stairway.  They further contend that he lacks standing under the CDPA or

**United States District Court**
For the Northern District of California

1  the Unruh Act to seek monetary damages for certain barriers inside the restaurant.  Finally,

2  defendants assert that claims relating to certain barriers are barred as a result of being raised too late

3  in this litigation.

4                          i.    <u>Standing to Remediate Stairway Barriers</u>

5          The United States Constitution restricts federal judicial power to the adjudication of "cases"

6  or "controversies."  U.S. Const. art. III, § 2, cl. 1.  Plaintiffs seeking to adjudicate their grievances in

7  federal court must first demonstrate that they have standing to sue— "an essential and unchanging

8  part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S.

9  555, 560 (1992).  To establish standing, a plaintiff must show that he or she has suffered or is

10  threatened with an injury that is both "concrete and particularized," and "actual or imminent, not

11  conjectural or hypothetical;" that there is a causal link between the injury and the conduct of which

12  the plaintiff complains—that is, that the injury is "fairly traceable" to the challenged conduct; and

13  that the injury is "likely" to be "redressed by a favorable decision."  *Bates v. United Parcel Serv.,*

14  *Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Lujan*, 504 U.S. at 560–61).

15          "The Supreme Court has instructed us to take a broad view of constitutional standing in civil

16  rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method

17  of obtaining compliance with the Act.'"  *Doran*, 524 F.3d at 1039 (quoting *Trafficante v. Metro.*

18  *Life Ins. Co.*, 409 U.S. 205, 209 (1972)).  The ADA provides that a plaintiff is entitled to bring an

19  action to correct both barriers he actually encountered and those he was actually deterred from

20  encountering.  42 U.S.C. §12188(a)(1).  A barrier will only satisfy *Lujan*'s "injury-in-fact"

21  requirement, however, if it relates to the plaintiff's particular disability.  *Chapman*, 631 F.3d at 947;

22  *see also id.* at 947, n. 4 ("We recognize that an encountered barrier must interfere with the particular

23  plaintiff's full and equal enjoyment of the facility, making his use of the facility more difficult than a

24  nondisabled individual's, to constitute an injury-in-fact, and that he is required to allege and prove

25  that injury.").

26          Rodriguez seeks to remediate several barriers pertaining to the construction and safety of La

27  Victoria's front steps: excessive riser height at the bottom of the steps; the lack of uniform stair

28  risers; incomplete handrails on the stairs; noncompliant grip on the handrails; and an absence of

caution striping on each step ("stairway safety barriers").  Assuming these architectural elements violate the ADAAG, they nonetheless do not relate to Rodriguez's particular disability.  *See Chapman*, 631 F.3d at 947.  The stairway safety barriers did not make Rodriguez's "use of the facility more difficult than a nondisabled individual's[.]"  *Id.* at 947, n. 4.[6]  By contrast, the absence of a wheelchair-accessible entrance (i.e., the lack of an ADA-complaint wheelchair ramp, lift, or other means of entering the facility in a wheelchair) plainly interfered with Rodriguez's full and equal enjoyment of the facility, thereby causing an injury-in-fact that could be redressed by a decision in his favor.  *See Lujan*, 504 U.S. at 561.

Although federal courts must maintain a broad view of constitutional standing in ADA cases, *see Doran*, 524 F.3d at 1039, the ADA "does not permit private plaintiffs to bring claims as private attorneys general to vindicate other people's injuries."  *Chapman*, 631 F.3d at 960 (quoting *McInnis–Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003) (quotation marks omitted)).[7] Because Rodriguez cannot demonstrate that the stairway safety barriers relate to his particular disability, he cannot demonstrate an "injury-in-fact" that can be redressed by court order.  Accordingly, Rodriguez does not have standing to challenge these architectural elements.

### ii.   Availability of Damages Under State Law

Standing to pursue monetary relief under the CDPA or the Unruh Act is different from standing to seek injunctive relief under federal or state law.  *See Reycraft v. Lee*, 99 Cal. Rptr. 3d 746, 756.  Both state statutes restrict damages recovery to situations where "the plaintiff personally encountered the violation on a particular occasion, or the plaintiff was deterred from accessing a

---

[6] Abdullah Mojaddidi testified that his friends carried him up the steps on several occasions.  This testimony, according to Rodriguez, demonstrates that wheelchair-bound persons can encounter the stairway safety barriers.  Tovar testified, however, that Rodriguez was not interested in being carried up the steps.  More crucially, even if Rodriguez were to be carried up the steps, he does not demonstrate that these specific architectural elements would make his use of La Victoria more difficult than for a nondisabled person.  While there is no question that La Victoria's inaccessible entrance makes Rodriguez's use of the restaurant more difficult, Rodriguez fails to demonstrate that his injury is "fairly traceable" to the challenged stairway elements.  *See Lujan*, 504 U.S. at 561.

[7] *See also Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("[W]e must put aside the natural urge to proceed directly to the merits of this important dispute and to 'settle' it for the sake of convenience and efficiency.  Instead, we must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable.").

United States District Court

For the Northern District of California

place of public accommodation on a particular occasion." *Munson*, 208 P.3d at 633; Cal. Civ. Code § 55.56. Unlike the ADA, these statutes require "something more than mere awareness of or a reasonable belief about the existence of a discriminatory condition." *Reycraft,* 99 Cal. Rptr. 3d at 756. Defendants assert that Rodriguez lacks standing to seek monetary damages for the barriers that existed inside the restaurant at the time of his 2008 visit. They argue that because Rodriguez remained in his vehicle during his visit to La Victoria and departed upon learning that there was no alternative entrance, he never came close to encountering any barriers on the premises. This argument is premised on the assumption that the restaurant entrance does not violate the ADA or state law in the first instance. By maintaining that the only noncompliant barriers were *inside* the restaurant, defendants argue that Rodriguez did not encounter any barriers to access. As discussed *infra*, however, the restaurant entrance violates the CDPA. Accordingly, there is no question that he was "deterred from accessing a place of public accommodation on a particular occasion." *Munson*, 208 P.3d at 633.

Although Rodriguez has standing to pursue monetary damages under state law, California Civil Code § 55.56 imposes a significant restriction on his potential recovery. That statute provides, in pertinent part:

> Statutory damages may be assessed [for construction-related accessibility claims under the CDPA or Unruh Act] based on each particular occasion that the plaintiff was denied full and equal access, and not upon the number of violations of construction-related accessibility standards identified at the place of public accommodation where the denial of full and equal access occurred. If the place of public accommodation consists of distinct facilities that offer distinct services, statutory damages may be assessed based on each denial of full and equal access to the distinct facility, and not upon the number of violations of construction-related accessibility standards identified at the place of public accommodation where the denial of full and equal access occurred.

Cal. Civ. Code § 55.56(e) (2009).[8] Accordingly, Rodriguez cannot recover separate minimum statutory damages for each barrier that was present at the time of his 2008 visit. The statute does not, however, affect his ability to recover actual damages.[9]

---

[8] Cal. Civ. Code § 55.56 was amended in 2012. Because Rodriguez filed his claim prior to the amendment, his claim is governed by the prior version of § 55.56. *See* § 55.56(f)(5) (2012).

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii.    April 2013 Barriers

Defendants further contend that several alleged barriers are not actionable because Rodriguez failed to incorporate them into his complaint.  When Rodriguez filed this action in 2009, his initial complaint identified five barriers.  An expert report, disclosed during the initial discovery period, identified ten additional barriers.  The Ninth Circuit then decided *Oliver v. Ralph's Grocery*, 654 F.3d 903 (9th Cir. 2011), holding that a plaintiff claiming discrimination under the ADA due to architectural barriers in a place of public accommodation must allege each barrier in his or her complaint.  Otherwise, the court held, defendants do not have fair notice of the claims against them as required under Federal Rule of Civil Procedure 8.  *Id.* at 908; Fed. R. Civ. P. 8.  "In general, only disclosure of barriers in a properly pleaded complaint can provide [fair] notice; a disclosure made during discovery, including an expert report, would rarely be an adequate substitute."  654 F.3d at 909.

In light of *Oliver*, Rodriguez was granted leave to amend his complaint in January 2013 so that he could incorporate the additional barriers identified during discovery.  (Docket No. 164).  The order granting leave to amend provided that discovery would be reopened, limited to the ten additional barriers identified in the FAC, until March 14, 2013.  In April 2013, after discovery closed, plaintiff's expert Jonathan Adler identified several *additional* barriers at the subject property ("April 2013 barriers"). [10]  Some of these newly-identified barriers allegedly arose as a result of alterations made to the subject property after this action commenced.  Rodriguez did not amend his complaint to incorporate the April 2013 barriers.  Nonetheless, he contends that defendants should be held liable for them.

At trial, Rodriguez claimed that *Oliver* should not govern this case, arguing that defendants had fair notice that their alterations to the subject property would create new barriers for wheelchair-bound patrons.  The court in *Oliver* left open the possibility that in some circumstances Rule 8

[9] Both the CDPA and the Unruh Act provide that plaintiffs can recover "actual" damages in excess of minimum statutory damages.  *See* §§ 52(a), 54.3(a).  The text of 55.56(e) makes clear that the provision applies only to statutory damages.  *See* § 55.56(e).

[10] These newly identified barriers included an inaccessible, newly constructed "patio" outside the restaurant, unsafe slopes near the entrance to the front steps, inadequate handicapped seating inside the restaurant, and inadequate maneuvering space at the top of the front steps.

**United States District Court**
For the Northern District of California

1   might require less, noting that "a disclosure made during discovery . . . would *rarely* be an adequate

2   substitute" for a barrier alleged in a complaint.  654 F.3d at 909 (emphasis added).  Here, however,

3   Adler's disclosure was made *after* discovery had closed.  Further, the order reopening discovery

4   specifically restricted discoverable subject matter to the additional barriers identified in the FAC.

5   To the extent that *Oliver* allows for rare circumstances where discovery disclosures suffice to

6   provide fair notice of alleged architectural barriers, Adler's 2013 report presents no such

7   circumstance.  Accordingly, the April 2013 barriers are not actionable.[11]  *See Paulick v. Starwood*

8   *Hotels & Resorts Worldwide, Inc.*, 2012 WL 2990760 (N.D. Cal. 2012) ("The *Oliver* court makes

9   clear . . . that it is only the complaint that should be considered in determining whether the fair

10  notice requirement has been met.").

11                          iv.     Remediated Barriers

12          "Where . . . a private plaintiff brings an ADA claim seeking to enjoin a defendant to remove

13  an architectural barrier, removal of the barrier before final judgment moots the ADA claim based on

14  that barrier."  *Hernandez v. Polanco Enterprises, Inc.*, 2013 WL 4520253 (N.D. Cal. 2013) (citing

15  *Oliver*, 654 F.3d at 905).  Prior to trial, the parties stipulated that several barriers have been

16  remediated since the commencement of this action.  (Pl. Exh. 56).  Accordingly, Rodriguez's ADA

17  claim is moot with respect to these barriers.  The remediated barriers are still actionable, however, to

18  the extent Rodriguez can establish he is entitled to damages under the CDPA or the Unruh Act due

19  to the presence of these barriers during his visit.  *Cf. Hernandez v. Polanco Enterprises, Inc.*, 2013

20  WL 4520253 (N.D. Cal. 2013) (granting motion for summary judgment against plaintiff's CDPA

21  and Unruh Act claims because plaintiff "made no showing that those barriers could support state-

22  law claims independent of the alleged [mooted] ADA violations").

23                          v.      Summary of Actionable Barriers

24          Rodriguez has an actionable ADA claim with respect to the following barriers, which were

25  properly identified in the FAC and have not been remediated:

26                          i.      the restaurant had no accessible public entrance for wheelchair users,

27

---

28  [11] Furthermore, it is far from clear that Rodriguez would have standing to remediate barriers not in
    existence at the time of his 2008 visit to La Victoria.

United States District Court

For the Northern District of California

   ii.  the restroom door lacked sufficient strike-edge clearance on the "push" side,

       thereby making it difficult for a wheelchair user to enter the restroom

       unassisted, and

   iii.  the restroom lacked sufficient strike-edge clearance on the "pull" side,

       thereby making it difficult for a wheelchair user to exit the restroom.

  Rodriguez has an actionable claim for damages under state law with respect to the following

barriers that were present during his 2008 visit and properly identified in the FAC:

   i.  the restaurant had no accessible public entrance for wheelchair users,

   ii.  the restroom door lacked sufficient strike-edge clearance on the "push" side,

       thereby making it difficult for a wheelchair user to enter the restroom

       unassisted,

   iii.  the restroom lacked sufficient strike-edge clearance on the "pull" side,

       thereby making it difficult for a wheelchair user to exit the restroom,

   iv.  the restroom lacked geometric signage,

   v.  the restroom's tactile signage was improperly located,

   vi.  the restroom door threshold was raised too high,

   vii.  the restroom door was too narrow,

   viii.  there was not enough space for a wheelchair to turn around inside the

       restroom,

   ix.  the restroom lacked sufficient space for a wheelchair user to transfer

       himself or herself to the toilet,

   x.  the side grab bar was improperly located,

   xi.  the lavatory counter surface was too high,

   xii.  the mirror was too high,

   xiii.  the paper towel dispenser was too high,

   xiv.  the sink was too high,

   xv.  the hot-water pipe beneath the sink was not insulated, thereby posing a burn

       threat to a wheelchair user, and

United States District Court
For the Northern District of California

1               xvi.    the dining room "order counter" was too high.

2    **C. Rodriguez's ADA Claim**

Rodriguez asserts a claim under the ADA, alleging defendants discriminated against him during his 2008 visit to La Victoria.  The parties do not dispute that Rodriguez is disabled within the meaning of the statute, nor do they contest whether defendants must comply with the ADA.  Instead, they focus on whether Rodriguez suffered discrimination within the meaning of the statute – an inquiry that hinges on which accessibility standards were applicable at the time of Rodriguez's visit.

          *i.     Applicable Standards: Was There an "Alteration"?*

After the 2007 kitchen fire, defendants undertook a variety of repairs.  Rodriguez claims that these repairs constituted an "alteration" within the meaning of the ADA, thereby triggering a heightened obligation to ensure that "altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  *See* 42 U.S.C. § 12183(a)(2).[12]  Defendants maintain that the post-fire repairs did not amount to an alteration.

The ADA does not define "alteration."  In the absence of a statutory definition, courts have looked for guidance to the Department of Justice, which is charged with promulgating administrative regulations to implement Title III's public accommodation provisions (§ 12186(b)), rendering technical assistance letters explaining the law's requirements (§ 12206(c)), and enforcing Title III in court (§ 12188(b)).  The DOJ's ADA Architectural Guidelines provide:

> [A]n alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof.
>
> > (1) Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

---

[12] Rodriguez further contends that the purported alterations affected a "primary function area," thereby requiring defendants to create access to the paths of travel and sanitary facilities serving the areas of alteration.  *See* 28 C.F.C. §§ 36.402(b), 36.403(b).

No. C 09-04057 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court

For the Northern District of California

1   (Appendix A to 28 C.F.R. § 36.402).[13]  Rodriguez argues that because the kitchen could not

2   function and the restaurant could not serve its customers during the 2007 fire repairs, the temporary

3   closure of La Victoria affected the usability of the restaurant, thereby constituting an "alteration"

4   under the ADA.  *See* 28 C.F.R. § 36.402(b).

5        Although the concept of "usability" is central to determining whether an alteration has been

6   made, neither the statute nor the DOJ's implementing regulations define the term.  *See Roberts v.*

7   *Royal Atl. Corp.*, 542 F.3d 363, 369 (2d Cir. 2008).  Moreover, few courts in the Ninth Circuit have

8   interpreted "usability."  The DOJ has stated, however, that it "remains convinced that the [ADA]

9   requires the concept of 'usability' to be read broadly to include any change that affects the usability

10  of the facility, not simply changes that relate directly to access by individuals with disabilities."

11  Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in

12  Commercial Facilities, 56 Fed. Reg. 35544, 35581 (July 26, 1991).[14]

13       In arguing that the post-fire repairs affected the "usability" of La Victoria, Rodriguez relies

14  on a 1998 DOJ opinion letter wherein the Acting Assistant Attorney General opines that

15  "[r]econstruction after a fire is considered an 'alteration.'"  DOJ Topic Opinion Letter 772, August

16  26, 1998 (ECF No. 232-3, Exh. 2).[15]  This letter was sent to a member of Congress who had

17  apparently requested guidance on behalf of a constituent who was preparing for reconstruction after

18

19  [13] Because the ADAAG was promulgated in exercise of the DOJ's statutory authority to issue
    regulations implementing Title III's public accommodation provisions, the DOJ's views reflected in

20  the ADAAG are due deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467
    U.S. 837 (1984).  *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (holding that an

21  administrative regulation "qualifies for *Chevron* deference when it appears that Congress delegated
    authority to the agency generally to make rules carrying the force of law, and that the agency

22  interpretation claiming deference was promulgated in the exercise of that authority.").

23  [14] This DOJ remark accompanies the final federal rule implementing 28 C.F.C. § 36.402, the
    provision defining "alteration."  By analyzing and commenting upon how "usability" should be

24  construed under § 36.402, the DOJ was offering an interpretation of its own regulations.  As such,
    these comments are accorded "substantial" deference.  *See Miller v. California Speedway Corp.*,

25  536 F.3d 1020, 1028 (9th Cir. 2008) ("The Justice Department's interpretation of its own regulations
    . . . must . . . be given substantial deference and will be disregarded only if plainly erroneous or

26  inconsistent with the regulation.") (quotation marks, citations, and alterations omitted).

27  [15] This correspondence was issued pursuant to the DOJ's authority to furnish technical assistance to
    individuals and entities concerning their obligations under the ADA.  *See* 42 U.S.C.A. § 12206.  To

28  the extent this letter interprets DOJ regulations, it is entitled to substantial deference.  *See Miller*,
    536 F.3d at 1028.

No. C 09-04057 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW

a fire destroyed a portion of the interior of his restaurant.  After summarizing the definition of "alteration" under § 36.402, the Acting Attorney General further explained:

> [I]f the damage caused by the fire is minor and can be corrected by cleaning, re-painting, or re-wallpapering, the ADA would not apply.  If walls are being reconstructed or new toilet fixtures or other elements are provided, the ADA requirements would apply.

*Id.*  These comments are not particularly instructive where, as here, the repairs include more than minor "cleaning, re-painting, or re-wallpapering" but less than the installation of *new* fixtures or the reconstruction of walls.[16]  Similarly, the La Victoria repairs fall somewhere between the illustrations bookending § 36.402's definition of "alteration."  While the post-fire work was somewhat more involved than "[n]ormal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems," the repairs were less extensive than the "remodeling, renovation, rehabilitation, reconstruction, historic restoration, resurfacing of circulation paths or vehicular ways, changes or rearrangement in the structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions" described in the ADAAG.  *See* 28 C.F.R. § 36.402.

Standing alone, the DOJ's guidance does not suffice to resolve whether the La Victoria repairs could or did affect usability, thereby constituting an "alteration" for purposes of the ADA.  Moreover, few courts in the Ninth Circuit have interpreted "usability" when assessing if an alteration has occurred.  Courts in other jurisdictions, however, have tended to take an expansive view of alterations that affect usability.  *See Disabled in Action of Penn. v. Southeastern Penn. Transp. Authority*, 635 F.3d 87, 91-94 (3d Cir. 2011) (under ADAAG guidelines, complete replacement of stairway or inoperative escalator is considered "remodeling, renovation, rehabilitation [or] reconstruction" that affects "usability," even

---

[16] Although the kitchen stove was replaced, this does not amount to the installation of a "new" fixture or element that might constitute an "alteration."  *See* Appendix A to 28 C.F.R. § 36.402. ("[C]hanges to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.")  Moreover, to the extent that repairs to the second-floor wall surrounding the exhaust hood could be characterized as "reconstruction," the second floor is not a primary function area.  As such, alterations confined to the second floor duct wall would not trigger "path of travel" obligations.  *See* 28 C.F.R. § 36.403.

United States District Court

For the Northern District of California

1  absent "major structural alterations"); *Regents of Mercersburg College v. Republic Franklin*

2  *Ins. Co.*, 458 F.3d 159, 162-64 (3d Cir. 2006) (repairs following "fire that caused extensive

3  damage to the roof and fourth floor of the building, as well as smoke and water damage to

4  the first, second, and third floors" constituted alteration); *Kinney v. Yerusalim*, 9 F.3d 1067,

5  1073 (3d Cir. 1993) ("if an alteration [such as resurfacing] renders a street more 'usable' to

6  those presently using it, such increased utility must also be made fully accessible to the

7  disabled through the installation of curb ramps").  In all cases, however, "alteration seems

8  generally to exclude from 'alterations' those modifications that essentially preserve the

9  status and condition of a facility, rather than rendering it materially 'new' in some sense."

10  *Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 370 (2d Cir. 2008).

11       The evidence presented at trial supports the conclusion that the post-fire repairs did

12  not render La Victoria materially "new" in any sense.  *See id.*  Instead, it tends to show that

13  the repairs essentially preserved the status and condition of the building.  The repairs around

14  the kitchen, second floor, and roof served to return the restaurant's stove and its attendant

15  systems to their working condition.  *See* Appendix A to 28 C.F.R. § 36.402.  ("[C]hanges to

16  mechanical and electrical systems are not alterations unless they affect the usability of the

17  building or facility.").  The remaining changes appear to have been mostly superficial in

18  nature.  While the precise extent of the post-fire repairs remains unclear, the evidence leads

19  to the conclusion that the post-fire repairs did not constitute an "alteration" for purposes of

20  the ADA.[17]

21  ───────────────

[17] Neither the ADA nor the ADAAG makes clear which party has the burden to prove that an
22  "alteration" did or did not occur, nor has the Ninth Circuit clarified the issue.  In *Roberts v. Royal
     Atl. Corp.*, the Second Circuit adopted a burden-shifting scheme for establishing whether a public
23  accommodation experienced a qualifying alteration:

24       To establish the existence of an alteration, a plaintiff fulfills his or her initial burden
         of production by identifying a modification to a facility and by making a facially
         plausible demonstration that the modification is an alteration under the ADA. The
25       defendant then bears the burden of persuasion to establish that the modification is in
         fact not an alteration.

26  542 F.3d 363, 371 (2d Cir. 2008).  The court in *Roberts* reasoned that while plaintiffs should
27  generally be capable of pointing to an initial modification potentially constituting an alteration,
     defendants "can be expected to have superior access to information with which to refute assertions
28  that their facilities have been altered within the meaning of the statute and the applicable regulations
     and commentary."  *Id.*  Here, ascertaining where the burden rests is not critical in that the conclusion

1

                 *ii.*     *Is Removal of the Barriers "Readily Achievable"?*

2

       In the absence of an "alteration" after January 26, 1992, the "readily achievable"

3

standards applied at the time of Rodriguez's visit to La Victoria.  Therefore, defendants

4

remained under a general, ongoing obligation to remove any architectural barriers where it

5

was "readily achievable" to do so.  *See* 42 U.S.C. § 12182(b)(2)(A)(iv).  The removal of

6

barriers is "readily achievable" when it is "easily accomplishable and able to be carried out

7

without much difficulty or expense."  *Id.* § 12181(9).  As the statute makes clear, that

8

standard encompasses a number of context-specific considerations:

9

                 In determining whether an action is readily achievable, factors to be considered

10

                 include--
                    (A) the nature and cost of the action needed under this chapter;

11

                    (B) the overall financial resources of the facility or facilities involved in the
                    action; the number of persons employed at such facility; the effect on

12

                    expenses and resources, or the impact otherwise of such action upon the
                    operation of the facility;

13

                    (C) the overall financial resources of the covered entity; the overall size of the

14

                    business of a covered entity with respect to the number of its employees; the
                    number, type, and location of its facilities; and

15

                    (D) the type of operation or operations of the covered entity, including the

16

                    composition, structure, and functions of the workforce of such entity; the
                    geographic separateness, administrative or fiscal relationship of the facility or

17

                    facilities in question to the covered entity.

18

*Id.* at § 12181(9).

19

       Defendants bear the initial burden of production as well as the ultimate burden of

20

persuasion in establishing that remediation is not readily achievable.  *See Rodriguez v.*

21

*Barrita, Inc.*, 2012 WL 3538014 (N.D. Cal. 2012); ECF No. 138.  "Further, defendants must

22

carry their burden with respect to each identified barrier to access in the facility."  *Id.*  Three

23

barriers remain at issue for purposes of Rodriguez's ADA claim: inadequate push-side

24

clearance on the restroom door, inadequate pull-side clearance on the restroom door, and the

25

inaccessible restaurant entrance.

26

27

of "no alteration" arises under either formulation.  Even if, consistent with *Roberts*, defendants in
the Ninth Circuit must shoulder the burden of persuasion, defendants here have successfully

28

established that the fire repairs did not constitute an alteration.

1                    1.  Restroom Door Barriers

2        La Victoria's restroom entrance poses two actionable barriers: inadequate strike-edge

3   clearance on both the "push" and "pull" sides of the restroom door.[18]  As a result of these related

4   barriers, individuals in wheelchairs are left with insufficient maneuvering space to open and close

5   the door when exiting or entering the bathroom.  The building, however, lacks sufficient physical

6   space to permit defendants to bring the door's strike-edge clearance into full compliance with the

7   ADAAG.  Due to the layout of the restaurant's interior walls and the placement of a stairway

8   leading to the second floor, defendants cannot feasibly create adequate maneuvering space on either

9   side of the restroom door.

10       Recognizing that full compliance is unworkable, Rodriguez contends that defendants must

11  instead install an automatic door opener.  Defendants reject this suggestion, claiming that no federal

12  statute or regulation explicitly requires the installation of an automatic door opener.  This argument

13  pays short shrift to the sometimes imperfect realities of disability access law compliance.  If entities

14  were required to provide disabled access only where they could do so in a manner fully and wholly

15  compliant with federal regulations, the ADA's scope would be unduly circumscribed.[19]  While

16  literal removal of the restroom barriers (i.e., reconstructing the building so as to allow for proper

17  strike-edge clearance on the restroom door) is not readily achievable, installation of an automatic

18  door opener may nonetheless be easily accomplished and can be carried out with minimal difficulty

19  or expense.  *See* § 12181(9).  While such a device would not change the actual strike-edge clearance

20  on the bathroom door, experts for both plaintiff and defendants agree that it would directly

21  remediate the problems posed by those barriers.[20]

---

22  [18] The "push" side requires twelve inches of space beyond the latching edge of the door.  On the
23  "pull" side, eighteen inches of clear space is required beyond the strike-edge (latch side) of the door.
    *See* ADAAG § 4.13.6.

24  [19] The DOJ plainly does not require all-or-nothing compliance with its regulations.  *See, e.g.*, Title
25  III Technical Assistance Manual ("TAM") § 4.4300 (where full compliance with federal
    accessibility standards is not readily achievable, "barrier removal measures may be taken that do not
26  fully comply with the standards, so long as the measures do not pose a significant risk to the health
    or safety of individuals with disabilities or others.").

27  [20] Alternately, 42 U.S.C. § 12182(b)(A)(v) provides a separate framework for addressing this
    imperfect, but apparently effective, method of remediating the restroom door barriers.  That
28  subsection provides what even where an entity can prove that removal of a barrier is not readily
    achievable, it nonetheless violates the ADA if it fails to "make such . . . facilities . . . available

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Defendants failed to prove that installation of an automatic door opener, a device that would

2    effectively remediate the barriers posed by the bathroom door, was not readily achievable.

3    Accordingly, defendants violated the ADA by failing to address the two restroom entrance barriers.

4    *See id.*

5            2.    Inaccessible Entrance

6    La Victoria lacks an accessible entrance for individuals in wheelchairs.  Rodriguez argues

7    that removal of this significant barrier is readily achievable.  Specifically, he contends that

8    defendants could readily install a wheelchair lift at the restaurant's entrance.  In support, plaintiff's

9    experts furnished three alternate proposals detailing wheelchair lifts that could be constructed on the

10   premises.  At trial, defendants presented minimal evidence to rebut plaintiffs' argument.  Relying

11   primarily on the cross-examination of plaintiff's experts, during which defendants' counsel elicited

12   information regarding the scope of construction work required to execute plaintiffs' proposals,

13   defendants maintain that installing any lift at the entrance would simply be too burdensome and

14   extensive of an undertaking to qualify as "readily achievable."  *See* § 12181(9).

15   Defendants concede that installing a wheelchair lift would not necessarily be cost

16   prohibitive.  At trial, they elected not to present evidence concerning their ability to pay for any of

17   Rodriguez's proposals.  Accordingly, to the extent that a fact-intensive, context-specific "readily

18   achievable" inquiry hinges in part on defendants' financial resources, these factors do not cut in

19   defendants' favor.  *See id.* (factors relevant to a "readily achievable" analysis include "the overall

20   financial resources of the facility or facilities involved in the action," the "effect on expenses and

21   resources," and "the overall financial resources of the covered entity").   Seizing upon this

22   concession and further emphasizing that defendants submitted no evidence on the actual cost of

23   remediating the barriers, Rodriguez argues that defendants failed to carry their burden to show that

24   installing a wheelchair lift is not readily achievable.

25

26   through alternative methods if such methods are readily achievable."  *Id.*  Here, installation of an
     automatic door opener is readily achievable.  Whether or not installing the door opener constitutes
27   "remov[al]" of an "architectural barrier" under subsection (iv) or an "alternate method" under
     subsection (v), the same result unfolds: defendants are obligated under the ADA to remediate the
28   problems posed by barriers (ii) and (iii).

Despite the paucity of defendants' affirmative evidence on the matter, applicable law compels the conclusion that installation of a wheelchair lift at La Victoria is not readily achievable. As the ADA makes clear, existing, non-altered facilities only need to remove barriers where removal can be carried out without much difficulty or expense. § 12181(9).  Elaborating upon the statutory standard, the ADAAG provides a list of "modest measures that may be taken to remove barriers and that are likely to be readily achievable."  28 C.F.R. Pt. 36, App. B at 647 (2000).  The regulations provide:

> Examples of steps to remove barriers include, but are not limited to, the following actions--(1) Installing ramps; (2) Making curb cuts in sidewalks and entrances; (3) Repositioning shelves; (4) Rearranging tables, chairs, vending machines, display racks, and other furniture; (5) Repositioning telephones; (6) Adding raised markings on elevator control buttons; (7) Installing flashing alarm lights; (8) Widening doors; (9) Installing offset hinges to widen doorways; (10) Eliminating a turnstile or providing an alternative accessible path; (11) Installing accessible door hardware; (12) Installing grab bars in toilet stalls; (13) Rearranging toilet partitions to increase maneuvering space; (14) Insulating lavatory pipes under sinks to prevent burns; (15) Installing a raised toilet seat; (16) Installing a full-length bathroom mirror; (17) Repositioning the paper towel dispenser in a bathroom; (18) Creating designated accessible parking spaces; (19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain; (20) Removing high pile, low density carpeting; or (21) Installing vehicle hand controls.

28 C.F.R. § 36.304(b).  While this list is plainly non-exhaustive, none of its examples come close to the extensive construction required to build, *and* provide an accessible path to, a wheelchair lift at the entrance to La Victoria.[21]  *Cf.* TAM § 4.4200 ("A public accommodation generally would not be required to remove a barrier to physical access posed by a flight of steps, if removal would require extensive ramping or an elevator . . . . [W]here it is not readily achievable to do, the ADA would not require a public accommodation to provide access to an area reachable only by a flight of stairs.").[22]  Moreover, while defendants concede that they could afford to build a wheelchair lift if required to do so, their admission does not alter the ADA's fundamental command that barrier removal is readily achievable only where it is "easily accomplishable and able to be carried out

---

[21] Moreover, the DOJ has explained that, in some circumstances, the aforementioned measures might not be readily achievable in the first place.  *See* 28 C.F.R. Pt. 36, App. B (1991) ("[T]he inclusion of a measure on this list does not mean that it is readily achievable in all cases.").

[22] The TAM is entitled to substantial deference.  *Miller*, 536 F.3d at 1028.

United States District Court

For the Northern District of California

1   without much difficulty *or* expense." 42 U.S.C. § 12181(9) (emphasis added). The evidence makes

2   clear that the proposed wheelchair lifts do not meet this standard.[23] Accordingly, under the ADA

3   defendants are not required to remove the barrier posed by the restaurant's inaccessible entrance.

4        They are not, however, off the hook with respect to this barrier. When an entity

5   demonstrates that the removal of an architectural barrier is not readily achievable, it nonetheless

6   discriminates against persons with disabilities if it fails "to make such goods, services, facilities,

7   privileges, advantages, or accommodations available through alternative methods if such methods

8   are readily achievable." *Id.* § 12182(b)(2)(A)(v). Defendants claim that La Victoria makes its

9   goods and services available to disabled patrons by (i) offering a fully accessible La Victoria

10  restaurant approximately one-half mile from the subject property and (ii) providing curbside service

11  at the subject property. As an initial matter, the offer of a fully accessible restaurant at another

12  location simply is not a viable alternative. If a wheelchair-bound patron arrives at La Victoria on

13  San Carlos Street with the intent of ordering, for example, a carne asada burrito with a side of the

14  restaurant's famous "orange sauce," she can hardly be expected then to travel an additional one-half

15  mile to place her order at a different establishment. While the patron may, upon seeing the front

16  steps, choose to take such a course of action, the mere existence of a separate La Victoria location

17  does not suffice to make the subject property's goods and services "available through alternative

18  methods." *See id.*

19       By contrast, the DOJ has explicitly recognized that offering curbside service is the sort of

20  measure that can satisfy an existing facility's "alternative method" obligations under the statute. *See*

21  28 C.F.R. § 36.305(b) ("Examples of alternatives to barrier removal include, but are not limited to

22  . . . [p]roviding curb service or home delivery[.]"). Here, however, the evidence does not

23  demonstrate that La Victoria actually offers such a service.[24] While Nicandro testified La Victoria

---

[23] Between the required site work, potential weeks of construction, a possible dialogue with the City to approve an encroachment into the sidewalk for a right-side incline lift, finalization of an easement from the neighboring property for Lifts B and C, and potential closure of the restaurant during installation, none of the proposed lifts are "easily accomplishable" or able to be carried out "without much difficulty." *See id.*

[24] As with their burden to prove that removal of a barrier is not readily achievable, defendants are obligated to prove that they made their goods and services available through alternative methods where it was readily achievable to do so.

provides curbside service to its patrons, his testimony did not indicate that the restaurant offers the service in a manner that is sufficiently consistent and reliable to constitute an "alternative method" under the statute.  Nicandro acknowledged that La Victoria does little to advertise the service at the restaurant or on its website.  Further, the restaurant's phone number is not displayed near the sidewalk for wheelchair-bound patrons to see.  Moreover, Abdullah Mojaddidi persuasively testified that he was unable to place an order successfully for curbside service during a visit in 2007.

In sum, while installation of a wheelchair lift is not "readily achievable" under the terms of the ADA, defendants nonetheless violated that statute by failing to make La Victoria's cuisine available through the readily achievable alternative method of providing curbside service. Accordingly, Rodriguez is entitled to injunctive relief to ensure that defendants make their goods and services available to disabled patrons.

**D. Rodriguez's State Law Claims**

Rodriguez also seeks injunctive and monetary relief under the CDPA and the Unruh Act. Having proven that three barriers violate the ADA, Rodriguez has therefore established that those same barriers violate both state statutes as well. *See* Cal. Civ. Code §§ 51(f), 54(c); *see also Moeller*, 816 F. Supp. 2d at 848.  Even given these automatic CDPA and Unruh Act violations, defendants' compliance with California disability access standards warrants additional discussion for several reasons.  First, with respect to the entrance stairway, Rodriguez can obtain a more significant form of injunctive relief if he can prove that defendants were obligated to provide an accessible entrance under state law.  Second, unlike his ADA claim, which is actionable only with respect to existing barriers, Rodriguez's claim for damages under state law is actionable for each barrier that existed during his 2008 visit.

*i.    Injunctive Relief under the CDPA*

As discussed above, barriers (i)-(iii) violate the ADA, thereby entitling Rodriguez to injunctive relief.  With respect to the two bathroom barriers, an injunction under state law would mirror the scope of an injunction under the ADA.  Accordingly, for purposes of injunctive relief under the CDPA, the aforementioned restroom barriers warrant no further discussion.  The inaccessible entrance, however, presents a different scenario.  Under the ADA, the restaurant

United States District Court

For the Northern District of California

entrance violates the law only because defendants fail to establish that they actually provide curbside service.  Accordingly, an injunction under the ADA can do no more than address this particular violation.  *See Lewis v. Casey*, 518 U.S. 343, 360 (1996) ("The scope of injunctive relief is dictated by the extent of the violation established.")  (quotation marks and citation omitted).  Rodriguez seeks much more than curbside service: he wants the barrier removed.  While federal law does not provide such a remedy here, California law does.

### 1.  Title 24 Obligations

Unlike the ADA, which only regulates alterations made after January 26, 1992, Title 24 of the California regulatory code governs all alterations made in public accommodations after January 31, 1981.  It requires that any "altered" portions of public accommodations, including entranceways, paths of travel, and public restrooms, be brought into compliance with the then-applicable accessibility standards.  Cal. Code Regs., tit. 24, § 2–105(b); *Moeller*, 816 F. Supp. 2d at 848.  Although the subject building far predates California's disability statutes, Rodriguez contends that the 1985 change in occupancy and the 1986 modifications constituted "alterations" under California law, thereby triggering an obligation to bring the building into compliance with the 1984 version of Title 24, which was applicable at that time.[25]

The 1979 Uniform Building Code, which was in effect in California in both 1985 and 1986, provides that an "alteration" is "any change, addition or modification in construction or occupancy."  Unif. Bldg. Code § 402 (1979).  In 1985, the City of San Jose granted the prior owner a municipal permit to change the building's occupancy from a residence to a deli and office space.  This event plainly constituted an "alteration" under the Code.  *See id.*  The following year, the prior owners modified the building pursuant to the aforementioned change in occupancy.  Defendants contend that the 1986 repairs were limited to the interior of the building.  By contrast, plaintiff's expert Jonathan Adler, after reviewing City records, opined that the prior owners made significant

---

[25] Rodriguez also claims that the 2007 fire repairs constituted an "alteration" under state law.  For the same reasons that the post-fire modifications do not constitute an "alteration" under the ADA, they do not qualify as an "alteration" under then-applicable California regulations.  *See* Bldg. C. 24-2 § 202-A (2001) ("Alter or alteration is any change, addition or modification in construction or occupancy or *structural repair* or change in primary function to an existing structure *other than repair or addition*.") (emphasis added).

1    modifications to the first and second floors of the building, including a new structural addition at the

2    rear of the building and a new stairwell at the entrance.

3    　　　Although the parties dispute the extent of the 1986 modifications, both sides' experts agree,

4    based on the City's records, that the modifications constituted an "alteration" for purposes of then-

5    applicable California law.  While these experts' *legal* conclusions lack relevance, their testimony is

6    nonetheless probative to the extent that it reflects their expert architectural opinions, based on

7    available records from the City, that the 1986 construction work was not minor or limited in scope.

8    While defendants do not admit that the City's records accurately reflect the scope and nature of the

9    1986 construction, they fail to provide any persuasive basis for concluding that the actual extent of

10   the 1986 modifications was different than the records indicate.  Moreover, evidence suggests that

11   defendants' conception of the 1986 modifications is unduly narrow.  For example, while defendants

12   apparently contend that the prior owners modified only the interior of the building, inspection notes

13   from a City building inspector reflect that the prior owners built a new addition at the back of the

14   structure.  (Pl.'s Exh. 12).  Regardless of whether this particular modification, which was apparently

15   added for the purpose of providing a private office space, would by itself trigger an obligation to

16   make the front entrance accessible, the discrepancy between defendants' position and the

17   documentary evidence suggests that defendants' conception of the 1986 modifications is

18   incomplete.  By contrast, plaintiff's evidence was persuasive as to the extent of the 1986

19   construction work.  Accordingly, the 1986 modifications served to "alter" the subject property.  *See*

20   *id.*

21   　　　Given that both the 1985 change in occupancy and the 1986 modifications constituted an

22   "alteration," the building's owners were obligated to comply with then-applicable disabled access

23   standards.  The 1984 version of Title 24 was in effect when each alteration occurred.  As an initial

24   matter, § 2-105(b)(11B)(4) of that title provides that when "alterations, structural repairs, or

25   additions" are made to existing privately-funded facilities, the modifications must be made in

26   compliance with subsections 11A(5)-(7), which govern alterations to publicly funded facilities.[26]

27   ─────────────────

28   [26] The Title 24 Interpretive Manual, prepared by the Office of the State Architect and the
     Department of Rehabilitation, further provides: "Very Important! The requirements for existing
     privately funded buildings that are to be remodeled are the same as for publicly funded.  So you are

United States District Court
For the Northern District of California

1    Cal. Code Regs., tit. 24 § 2-105(b)(11B)(4) (1984).  Subsection 11A(5), in turn, provides that state

2    disability compliance regulations apply to:

3        All existing public funded buildings and facilities when alterations, structural repairs
         or additions are made to such buildings or facilities.  This requirement shall only

4        apply to area [sic] of specific alteration, structural repair or addition and shall not be
         construed to mean that the entire structure or facility is subject to this Code.

5        Compliance shall require:

6            (a) That a primary entrance to the building or facility and the primary path of
             travel to the specific area shall be accessible to and usable by handicapped

7            persons.

8            (b) That sanitary facilities, drinking fountains, and public telephones serving
             the remodeled area shall be accessible to and usable by handicapped persons.

9

10   *Id.* § 2-105(b)(11A).  While this provision, when read in light of subsection 11B(5), makes clear that

11   the regulations apply only to areas of "specific alteration, structural repair, or addition," it is equally

12   plain that when any such modification occurs in an existing privately-funded place of public

13   accommodation, the building's primary entrance "shall be accessible to and usable by handicapped

14   persons."  *Id.*  The text of Title 24 therefore compels the conclusion that the building's prior owners

15   were, in both 1985 and 1986, required to make the building's primary entrance accessible to and

16   usable by disabled individuals.  Because the La Victoria entrance was inaccessible in November

17   2008, defendants denied Rodriguez equal access to the restaurant.

18                                2.   "Reliance" Defense

19       Defendants contend they cannot be held liable for the prior owners' failure to remediate the

20   inaccessible front entrance.  In particular, defendants claim they relied upon the City of San Jose's

21   1986 approval of the prior owners' application for an unreasonable hardship exception from

22   disability access requirements.  In support, they invoke *Donald v. Cafe Royale, Inc.*, wherein the

23   California Court of Appeal held that CDPA's damages provision contains no intent requirement.

24   218 Cal. App. 3d 168, 180, 266 Cal. Rptr. 804 (Ct. App. 1990).  The court then stated, in apparent

25   dicta:

26       Our interpretation that section 54.3 contains no intent element does not preclude the
         possibility that in some instances denial of access under the statute may be excused,

27

28   referred to the publicly funded sections to get this information."  Disabled Access Regulations: Title
     24 Interpretive Manual (August 16, 1984), *available at* ECF No. 232-3.

> *e.g.*, where the violator has been affirmatively directed, or given formal approval, by an enforcing agency to construct premises in a certain way, or maintain a configuration, which does not comply with the code requirements.

*Id.*; *see also D'Lil v. Stardust Vacation Club*, 2001 WL 1825832 (E.D. Cal. 2001) ("A defendant's good faith reliance on an agency's erroneous legal opinion may in some instances preclude liability.") (citing *Donald*, *supra*).[27]  Relying upon the aforementioned authorities, defendants maintain that the undue hardship exception, even if improvidently granted, operates to preclude liability under the CDPA.

Rodriguez asserts that defendants' argument fails for several reasons.  First, because defendants did not raise the "reliance" defense in their answer or amended answer, Rodriguez contends he was not on notice of the issue and therefore could not conduct adequate discovery into the circumstances underlying the prior owners' hardship application.  Second, he disputes whether, as a matter of law, a "reliance" defense can preclude liability under the CDPA.  Finally, Rodriguez argues that even assuming such a defense is available, defendants cannot demonstrate that they actually relied upon the City's 1986 approval of the hardship application.

Without considering whether Rodriguez was on notice of the reliance argument, and regardless of whether an occupant or owner of a building subject to Title 24 disabled access regulations can avoid CDPA liability by relying upon a municipal building department's approval of a prior owner's undue hardship application, no facts arise to support such an argument here.  The evidence at trial established that no defendant actually relied on the City of San Jose Building Department's 1986 approval.  To the contrary, it appears defendants were not aware of the hardship exception until after Rodriguez filed this action.  Defendants instead premise their reliance argument on the fact that from 1986 to 1998, when La Victoria opened, the Department continually permitted prior occupants to operate several different restaurants within the building.  As such, when La

---

[27] *But cf. D'Lil v. Best W. Encina Lodge*, 2004 WL 3685756 (C.D. Cal. 2004) (rejecting defendants' argument that a municipal building department's issuance of building permits later estopped plaintiff's claims against the subject property under federal and state disability law) ("Essentially, this argument attempts to equate a building permit with a declaratory judgment that the subject property adheres to all applicable laws. None of the cases cited by Defendants, or any others found by this Court, indicate that the issuance of a building permit compels any conclusion in the context of litigation between the property owner and a private party suing under state and federal accessibility laws.").

United States District Court
For the Northern District of California

1  Victoria began leasing the space in 1998, and when Shahidi purchased the building in 1999,

2  defendants were purportedly operating under the assumption that the building was not saddled with

3  extant access obligations.  This is not enough to excuse compliance.  *Cf. Hodges v. El Torito*

4  *Restaurants, Inc.*, 1998 WL 95398 (N.D. Cal. 1998) (holding current owner liable for prior owner's

5  failure to remediate barriers to access) ("It is therefore clear that the best way to effectuate the goals

6  of California's accessibility laws is to hold the current owners of buildings liable for existing

7  violations.").

8         In sum, to the extent that a "reliance" exception to Title 24 compliance exists, defendants fail

9  to establish it here.  *See N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001)

10  (noting "the general rule of statutory construction that the burden of proving justification or

11  exemption under a special exception to the prohibitions of a statute generally rests on one who

12  claims its benefits") (quotation marks and citation omitted).  Accordingly, pursuant to defendants'

13  Title 24 obligations as triggered by the 1985 and 1986 alterations, La Victoria's entrance must be

14  made accessible to persons with disabilities.

15                 *ii.*      *Monetary Damages Under State Law*

16         Rodriguez seeks monetary relief under the CDPA and the Unruh Act.  As discussed above,

17  barriers (i), (ii), and (iii) automatically trigger liability under both laws as a result of also violating

18  the ADA.  Additionally, barriers (iv) through (xvi) violated applicable California regulations. [28]

19  With respect to these barriers, defendants are liable under the CDPA.  They are not, however, liable

20  for barriers (iv) through (xvi) under the Unruh Act because absent an ADA violation, Rodriguez

21  must demonstrate that defendants intentionally discriminated against persons with disabilities.

22  While defendants should have been in compliance with federal and state disability access

23

24  _____

25  [28] The parties stipulate that these barriers existed at the time of Rodriguez's visit.  In so stipulating,
    the parties include citations to a recent version of the California Building Code.  ECF No. 214, Exh.
26  B (providing corresponding CBC provisions for each stipulated barrier); *see also* Pl's Exh. 56
    (updated barrier list lacking corresponding citations).  As discussed *supra*, the 1985 and 1986
27  alterations triggered an obligation to comply with then-applicable California accessibility standards.
    It is less than clear, though, that these architectural elements were also barriers under earlier
28  versions of the code.  Defendants do not, however, contend that any of these barriers are
    permissible under the 1984 version of Title 24.  If any such argument exists, it has been waived.

1  requirements at the time of Rodriguez's visit, the evidence falls far short of demonstrating that they

2  intentionally discriminated against persons with disabilities.

3    **E.  Summary**

4       The evidence presented at trial establishes that barriers (i), (ii), and (iii) constitute violations

5  of the ADA, the Unruh Act, and the CDPA.  Further, defendants violated the CDPA by maintaining

6  barriers (iv) through (xvi) at the time of Rodriguez's visit.

7       Defendants, who are jointly and severally liable, are hereby ordered to provide the following

8  relief:

9       1.  Pursuant to their obligations under Title 24, defendants shall make the building's primary

10          entrance accessible to and usable by disabled individuals.

11      2.  Until the entrance is made accessible, defendants shall make La Victoria's cuisine

12          available to disabled patrons through the readily achievable alternative method of

13          providing curbside take-out service.

14      3.  Defendants shall install an automatic door opener on the restroom door so that disabled

15          patrons can safely enter and exit the restroom without assistance.

16      4.  Defendants shall pay Rodriguez $12,000 in actual damages.[29]

17      The parties are directed to meet and confer and jointly submit a proposed judgment

18  consistent with this order within thirty days.  A motion on attorney fees shall be filed within sixty

19  days if the parties are unable to agree on the amount.

20      IT IS SO ORDERED.

21  Dated:  1/3/14

22                                    RICHARD SEEBORG
                                      UNITED STATES DISTRICT JUDGE

23

24  [29] As noted above, defendants' cumulative violations of the CDPA and the Unruh Act do not
    compound Rodriguez's statutory minimum damages.  *See* Cal. Civ. Code § 55.56(e); *Org. for*
25  *Advancement of Minorities with Disabilities v. Pac. Heights Inn*, 2006 WL 2560754 (N.D. Cal.
    2006) (summarizing authorities as holding that statutory damages for disability discrimination "are
26  limited to each time that a plaintiff visits (or is deterred from visiting) a non-compliant
    establishment even if the establishment contains numerous architectural barriers"); *see also Munson*,
27  208 P.3d at 632 (no double recovery between the CDPA and the Unruh Act).  In any event, as actual
    damages of $12,000 are being awarded due to the significant emotional distress Rodriguez suffered
28  as a result of being denied equal access to La Victoria, statutory damages are not directly implicated.