1
2
3
4
5
6          IN THE UNITED STATES DISTRICT COURT
7          FOR THE NORTHERN DISTRICT OF CALIFORNIA
8          SAN FRANCISCO DIVISION
9
10   ARMANDO RODRIGUEZ,                              No. C 09-04057 RS

11              Plaintiff,
                                                     **ORDER ON PLAINTIFF'S MOTION**
12        v.                                         **FOR ATTORNEY FEES AND COSTS**

13   BARRITA, INC., dba LA VICTORIA
     TAQUERIA; NICANDRO BARRITA;
14   ENS ASSOCIATES INVESTMENTS,
     LLC; MASOUD SHAHIDI; NICANDRO
15   BARRITA; and DOES 1 through 10,
     inclusive,
16
                Defendants.
17   _____/

18                    I.    INTRODUCTION

19        In this disability access case, prevailing plaintiff Armando Rodriguez seeks $1,444,513.84 in

20   attorney fees, litigation expenses, and costs from defendants Barrita Inc., Nicandro Barrita, ENS

21   Associates, and Masoud Shahidi.  More specifically, he requests $763,691 for "merits" (i.e., through

22   the end of trial) attorney fees, $50,125 in post-trial attorney fees, and $248,671.84 in litigation

23   expenses and costs.  Plaintiff also seeks a 1.5x multiplier on the merits fees, adding $381,846 to his

24   overall request.  Defendants agree that Rodriguez is entitled to fees and costs, but they argue he

25   seeks too much.  In defendants' estimation, plaintiff is entitled to $391,770.50 in attorney fees and

26   $17,991.74 in taxable costs and expenses.  Unsurprisingly, the appropriate amount falls somewhere

27   along the million-dollar spectrum between the parties' requests.  For the reasons explained below,

28   plaintiff is entitled to $584,805.60 in attorney fees and $173,348.29 in costs and litigation expenses,

resulting in a total award of $758,153.89.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

## II.     LEGAL STANDARD

The calculation of a reasonable fee award involves a two-step process.  *Fisher v. SJB–P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000).  First, the court calculates the presumptive fee award, also known as the "lodestar figure," by taking the number of hours reasonably expended on the litigation and multiplying it by a reasonable hourly rate.  *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  Second, in "appropriate cases" the court may enhance or reduce the lodestar figure based on an evaluation of the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975), that were not taken into account in the initial lodestar calculation.  *Intel Corp. v. Terabyte Intern., Inc.*, 6 F.3d 614, 622 (9th Cir. 1993) (citation omitted).[1]  The Ninth Circuit has cautioned that there is a "strong presumption" that the lodestar figure represents a reasonable fee and that adjustment upward or downward is "the exception rather than the rule."  *D'Emanuele*, 904 F.2d at 1384.

## III.     DISCUSSION

As a threshold matter, it is undisputed that Rodriguez is entitled to attorney fees.  A prevailing plaintiff under the ADA "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."  *Barrios v. California Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting *Hensley*, 461 U.S. at 429).  Additionally, the California Disabled Persons Act provides for attorney fees to prevailing parties as a matter of right.  Cal. Civ. Code § 55.  Here, where Rodriguez prevailed under both statutes, defendants do not contest that fees are warranted.  The question, rather, is how much.

### A. Lodestar Rates

The fee applicant bears the burden of producing satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895, n.11

---

[1] The *Kerr* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Kerr*, 526 F.2d at 70.

1   (1984).  "Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the

2   community, and rate determinations in other cases, particularly those setting a rate for the

3   plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate."  *United Steelworkers*

4   *of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  Courts also may rely on

5   decisions by other courts awarding similar rates for work in the same geographical area by attorneys

6   with comparable levels of experience.  *See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 917 (9th Cir.

7   2009).  As a general rule, the forum district represents the relevant legal community.  *See Gates v.*

8   *Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

9                                    i.      *Celia McGuinness*

10          Celia McGuinness, plaintiff's trial counsel and the lead lawyer on this case, seeks fees at the

11  rate of $550/hour.  In support, she submits declarations from four Bay Area disability access

12  attorneys, all of whom attest that McGuinness's requested rate is reasonable for an attorney of her

13  skill, experience, and reputation.  McGuinness also furnishes excerpts from numerous cases in this

14  district where the court awarded fees at her then-requested rates.  The most recent excerpt is from

15  *Hernandez v. Grullense*, 2014 WL 1724356 (N.D. Cal. Apr. 30, 2014), where the court approved

16  her request for fees at $495/hour in a motion filed in December 2013.

17          This fee motion, filed in March 2014, apparently marks the first time McGuinness has

18  requested fees at $550/hour—a rate significantly higher than the $495/hour requested and awarded

19  in other recent cases.  *See, e.g., Cruz v. Starbucks Corp.*, 2013 WL 2447862 at *7 (N.D. Cal. June 5,

20  2013).  Defendants, however, do not contest that $550/hour is a reasonable rate for McGuinness in

21  2014.[2]  Indeed, McGuinness has extensive experience representing plaintiffs in disability access

22  cases, and she served as a skilled and persuasive advocate for her client over the course of this

23  litigation.  Given McGuinness's skill, experience, and reputation, $550/hour is a reasonable rate for

24  her services.

25

26

27

28  [2] Instead, as discussed below, defendants contest whether McGuinness and Rein should be awarded
    fees at their current rates for all hours worked since the case began in 2009.

United States District Court
For the Northern District of California

<strong>United States District Court</strong><br>For the Northern District of California

ii.     *Paul Rein*

Paul Rein, owner of Rein Law Offices and member of the California bar for over forty-five years, requests fees at $645/hour.  In support, plaintiff points to numerous recent court decisions finding this to be an appropriate rate for Rein's services.  Within the last fifteen months, four different judges in this district have found $645/hour to be a reasonable rate in light of Rein's skill, reputation, and extensive experience.  *See Hernandez,* 2014 WL 1724356 at *5, *Moralez v. Whole Foods Mkt., Inc.*, 2013 WL 3967639 at *4 (N.D. Cal. July 31, 2013); *Cruz,* 2013 WL 2447862 at *5; *Delson v. CYCT Mgmt. Grp., Inc.*, 2013 WL 1819265 at *5 (N.D. Cal. Apr. 30, 2013).  Indeed, defendants do not contest that $645/hour is a reasonable rate for Rein's services in 2014.  Plaintiff's submissions and argument substantiate Rein's request for attorney fees at the reasonable rate of $645/hour.

iii.     *Catherine Cabalo*

Catherine Cabalo, plaintiff's third attorney, seeks fees at a rate of $425/hr.  Cabalo, a 2001 graduate of the University of Washington, has been working for Rein Law since 2009.  Her rate is supported by the declaration of Bryan Gearinger, a Bay Area disability law attorney who has been practicing for twenty-three years.  Plaintiff also points to several recent court decisions finding that $425/hour is a reasonable rate for Cabalo's work.  *See Moralez*, 2013 WL 3967639 at *3; *Cruz,* 2013 WL 1819265 at *2.  Defendants do not contest Cabalo's requested rate.  Cabalo will be awarded attorney fees at the reasonable rate of $425/hour.

iv.     *Rein Firm Paralegals*

Aaron Clefton, a Rein Firm paralegal, requests fees at $200/hour.  This rate would mark an increase from several recent cases in this district finding that $175/hour is a reasonable price for Clefton's work.  *See Hernandez,* 2014 WL 1724356 at *4; *Cruz*, 2013 WL 2447862 at *5.  Indeed, in *Cruz*, the court denied Clefton's request for fees at $200/hour, instead awarding him fees at the rate of $175/hour.  Plaintiff claims an increase is warranted to reflect that "few other paralegals . . . possess both [Clefton's] years of experience and his understanding of disability rights law."  (Pl. Repl., ECF No. 260, 2:1-2).  Indeed, Clefton has been working as a paralegal for more than a decade, spending nine years with Rein Law.  In addition, Clefton has attended several semesters of

United States District Court

For the Northern District of California

law school and anticipates completing his Juris Doctorate at some point in the future.  When Clefton finishes school and becomes a member of the bar, he will doubtlessly be justified in increasing his rate substantially.  For now, however, plaintiff's submissions fail to establish that $200/hour is a reasonable rate for Clefton's work as a paralegal.  Accordingly, Clefton will be awarded fees at the reasonable rate of $175/hour.

Holly Jaramillo, a Rein Law paralegal with much less experience than Clefton, requests fees at the rate of $135/hour.  Defendants do not address, much less rebut, Jaramillo's request.  She will accordingly be awarded fees at the reasonable rate of $135/hour.

*v.    Current Rates vs. Historical Rates*

Defendants maintain it would be unreasonable for plaintiff's attorneys to receive their current rates for litigation that began in 2009 and culminated in a 2014 judgment.  They request instead that Rein be awarded $495/hour for all hours worked before 2012 and McGuinness be awarded $495/hour for all hours logged before 2014.[3]

The court has discretion to apply the rates in effect at the time the work was performed.  *See Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997).  It may also award fees at an attorney's current rate where appropriate to compensate for the lengthy delay in receiving payment.  *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).  Here, Rein Law put a significant amount of time and effort into litigating Rodriguez's claims, without any promise of payment, in an attempt to vindicate plaintiff's civil rights under federal and state disability law.  Nearly five years have passed since the commencement of this case, during which time plaintiff's counsel received no payment for their services.  Considering this lengthy delay, the fee award should not be based entirely on counsel's historical rates at the time the work was performed.

At the same time, in a case where more than 1,250 hours were expended by these two attorneys over nearly five years, adjusting fees based on current rates has a significant impact on the overall award.  Under these circumstances, awarding *all* fees at counsel's current rates would cause an inordinate and unwarranted increase in the overall fee award.  *See Oldoerp v. Wells Fargo & Co.*

---

[3] With respect to Rein, defendants' request is based on a 2011 case awarding him fees at the rate of $495.  As to McGuinness, as discussed above, numerous judges in this district awarded her fees at a reasonable rate of $495/hour in 2013.

*Long Term Disability Plan*, 2014 WL 2621202 at *4 (N.D. Cal. June 12, 2014) (appropriate to award fees at current rates where doing so "does not trigger an inordinate increase in the overall fee award"). In particular, it would be unreasonable to award McGuinness—who logged more than 1,100 hours—$550/hour for all work performed as far back as 2009. This is especially so where, unlike Rein, McGuinness requested fees at a lower rate in other cases mere months before filing this motion. In *Hernandez*, where McGuinness requested fees at $495/hour, the plaintiff's fee motion was filed in December 2013. *See* 12-cv-1280 WHO, ECF No. 72 (N.D. Cal. Dec. 20, 2013). This motion, filed some ten weeks later, requests she be paid at $550/hour, representing a $55—or 11%—increase in her hourly rate. While this rate reasonably reflects the value of McGuinness's services in 2014, the overwhelming majority of her time spent in this case (approximately 93%) occurred in 2013 and earlier.

McGuinness will be awarded her 2013 rate ($495) for all hours worked during and before 2013. By paying McGuinness $550/hour for all hours worked in 2014, the fee simultaneously acknowledges the reasonableness of her current rate while guarding against the unreasonable overall fee increase that would occur if the rate was applied to *all* hours expended in this litigation. Moreover, by applying McGuinness's 2013 rate for hours performed as far back as 2009, the award still accounts for the lengthy delay in receiving payment.[4] *See Jenkins*, 491 U.S. at 284. No similar such adjustment is warranted for Rein, whose current rate of $645 was affirmed by numerous court decisions over a year ago. If, as defendants request, Rein were awarded $495/hour for all hours logged before 2012, the award would not sufficiently reflect the lengthy delay in payment. McGuinness's award, by contrast, only adjusts her payment commensurate with a rate she requested some ten days before the start of this calendar year.

B. Lodestar Hours

The party seeking fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended[.]" *Hensley*, 461 U.S. at 437. After the moving party

_____

[4] In 2010, for example, McGuinness's requested rate was $395/hour. *See Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1084 (N.D. Cal. 2010). If she were awarded fees at that rate for hours worked in the first few years of this case, the resulting award would not sufficiently account for the lengthy delay in payment.

United States District Court
For the Northern District of California

provides evidence of the hours billed, the opposing party has the burden of submitting evidence "challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates*, 987 F.2d at 1397-98 (citing *Blum v. Stenson*, 465 U.S. 886, 892 n. 5 (1984)).  Even if the opposing party has not objected to the time billed, the district court "may not uncritically accept a fee request," but is obligated to review the time billed and assess whether it is reasonable in light of the work performed and the context of the case. *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002) (citing *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984)).  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, 461 U.S. at 433.  A district court should also exclude from the lodestar fee calculation any hours that were not "reasonably expended," such as hours that are excessive, redundant, or otherwise unnecessary. *See id.* at 433–34.

> ### i.   *General Allegations of Overbilling*

As an initial matter, defendants object that plaintiff's counsel could not have reasonably spent more than 1,700 hours prosecuting a disability access case that culminated in a four-day bench trial.  Defendants use Rein Law's expertise as a sword against the firm, arguing such seasoned attorneys need not spend so much time on a "relatively straightforward" case like this one.  (*See* Def. Opp., ECF No. 276; 1:7).  Indeed, in other cases, judges of this district have noted that Rein Law's expertise in disability access law should allow the firm to work through routine litigation matters in an efficient manner.  *See Hernandez*, 2014 WL 1724356 at *6 ("Given Rein Law's extensive experience litigating ADA cases, Rein Law is expected to efficiently complete the relevant court filings and other tasks necessary to the litigation of this action."); *Delson*, 2013 WL 1819265 at *8 ("One of the trade offs of being an expert in a specific field of law is the expectation that tasks will be completed with greater efficiency because the knowledge base and resources have already been well-established.").  This case was not, however, as straightforward as defendants imply.  Although the subject property is small, and while plaintiff's claims were typical for a disability access case, the parties litigated several thorny legal issues involving questions that have

1    yet gone unanswered in the relevant appellate courts.  Moreover, unlike *Delson* and *Hernandez*, this

2    case took nearly five years to resolve.

3            As explained below, however, defendants identify several infirmities in plaintiff's billed

4    hours.  Rein Law, acknowledging the difficulties of ensuring airtight billing practices over the

5    course of a five-year case, offers to take a 5% overall cut in order to guard against inefficiencies or

6    inconsistencies in its billing practices.  (*See* Pl. Repl., ECF No. 282, 20:2).  While the court has

7    discretion to impose a uniform reduction of this sort, it is doubtful that a 5% reduction, or even a

8    10% reduction, would result in a reasonable fee award.  *See Moreno v. City of Sacramento*, 534 F.3d

9    1106, 1112 (9th Cir. 2008) (district court can impose a unilateral 10% fee haircut "based on its

10   exercise of discretion and without a more specific explanation").  Accordingly, defendants'

11   objections will be addressed one by one, resulting in discrete reductions where appropriate.

12                    *ii.    Co-Counsel Conferencing*

13           Defendants argue that plaintiff's attorneys spent too much time conferencing with one

14   another.  In sum, Rodriguez's counsel claims to have spent 92.8 hours in attorney co-conference.

15   Much of this time is attributable to Rein, who reportedly spent 38.8 hours (24% of his total time)

16   conferencing with co-counsel.  In several other cases in this district, Rein Law's fee requests have

17   been reduced to account for excessive co-conferencing.  In *Cruz*, the court noted that while it was

18   "reluctant to second-guess the staffing decisions of Plaintiff's counsel, given that the approach taken

19   by counsel was successful," it nonetheless was "troubled by the fact that nearly half of the time

20   billed by McGuinness was spent in meetings and conferences with co-counsel and Rein spent over

21   20% of his time in conferences with co-counsel."  2013 WL 2447862 at *8.  To account for these

22   concerns, the court reduced Rein's and McGuinness's overall hours, with the exception of those

23   spent on the fee award reply brief, by 37% and 11%, respectively.  *Id.*  More recently, in *Hernandez*,

24   the court imposed a 50% reduction on *all* time spent conferencing, citing similar concerns.  2014

25   WL 1724356 at *7.  As explained above, however, this case was lengthier, and apparently more

26   complex, than *Cruz* or *Hernandez*, both of which culminated in consent decrees within eighteen

27   months of the complaint's filing.  Unlike in those cases, it is not facially apparent that the time spent

28   co-conferencing was excessive as a categorical matter.

left margin text**United States District Court**
For the Northern District of California

More troubling, however, is that many of plaintiff's "conferencing" entries simply do not match up.  Of Rein's 38.8 hours spent conferencing with others at his firm, 24.4 of those hours cannot be verified by a matching entry from another firm member or employee.  If Rein spent this time "conferencing" with another attorney or paralegal at Rein Law, defendants could reasonably expect the conference to be corroborated by the billing entries of another person working on the matter.  Plaintiff's attorneys do not dispute that Rein's conferencing hours do not match those of his co-counsel.  Instead, they contend that these billing disparities "evidence[] billing judgment," resulting "in a cost savings" for defendants.  (Pl. Repl., ECF No. 282, 6:15).  At oral argument and in a supplemental declaration, McGuinness explained that in an attempt to craft a reasonable fee request, she chose not to bill for certain hours spent conferencing with Rein.  This may be so, but the resultant gap is simply too large to be explained away by these supplemental statements when the prevailing party carries the burden of showing that his counsel's hours were reasonable.  "While the exercise of billing judgment is generally a good thing, the benefits are not realized in cases like this where Rein Law evidently exercised billing judgment in favor of its most expensive attorney." *Hernandez*, 2014 WL 1724356 at *11.

None of this is to suggest that some impropriety is afoot in the Rein Law conference room.  There is no reason McGuinness should not be taken at her word that these billing disparities can be explained by her own restraint and judgment.  This does not mean, however, that Rein's declarations automatically are sufficient to demonstrate his entitlement to all claimed fees.  This is especially so where, as here, defendants point to significant disparities in counsel's bills.  Even had defendants failed to challenge this particular billing practice, it would be improper to "uncritically accept" Rodriguez's free request.  *See Common Cause*, 235 F. Supp. 2d at 1079.  In light of plaintiff's failure to meet his burden of documenting the appropriate hours expended, *see Hensely*, 461 U.S. at 437, Rein's conferencing time will be reduced by 24.4 hours.  So, too, will 2.6 uncorroborated hours of Cabalo's conference time.

### iii.    Criminal Background Research

Plaintiff's counsel spent 11.9 hours investigating defendants' criminal histories.  Defendants contend this time should be excluded entirely, as all evidence of defendants' prior convictions was

excluded at trial. It was reasonable, however, for plaintiff to investigate defendants' criminal records. Although the evidence was ultimately excluded at trial, plaintiff initially did not know what defendants' records would reveal. Had defendants been convicted more recently, or had the convictions stemmed from acts of dishonesty, evidence of defendants' criminal histories may have been admissible. Accordingly, plaintiff cannot be faulted, as a categorical matter, for conducting criminal history research in anticipation of trial.

### iv.   *Clefton's Attendance at Depositions and Pre-Trial Hearings*

Paralegal Clefton spent 40.9 hours attending depositions and pre-trial conferences. In *Cruz*, the court barred Clefton from being paid for attending a case management conference, finding that Rein Law "ha[d] not offered any explanation" for Clefton's need to attend such an event. 2013 WL 2447862 at *7. Here, by contrast, plaintiff's counsel provides reasons for Clefton's attendance at these non-trial events. McGuinness declares that Clefton was very helpful in making important documents available and taking extensive notes in the "document-intense" depositions in this case. (Pl. Repl., ECF No. 282, 4:10). According to McGuinness, Clefton's attendance at the pretrial conference was "necessary" for trial preparation. (*Id.* at 4:17). In the context of this complicated, fact-intensive case, plaintiff's submissions are sufficient to substantiate his claim that it was reasonable for Clefton to spend 40.9 hours assisting at these events.

### v.   *Cabalo's Attendance of an Unrelated Trial*

On August 7, 2013, Catherine Cabalo spent 3.5 hours observing an unrelated trial in order to "evaluate and determine motions *in limine* and jury instructions, etc." It would be unreasonable for defendants to pay well over $1,000 for Cabalo's educational field trip to the courtroom. These 3.5 hours will be deducted from Cabalo's time.

### vi.   *Time Spent on Alternative Dispute Resolution*

In *Delson*, the court concluded that Rein Law engaged in duplicative billing practices relating to mediation preparation and attendance. 2013 WL 1819265 at *7. The court in *Hernandez* made a similar finding, holding it was "excessive" for Rein and Cabalo to spend 15.5 hours and 20.8 hours, respectively, to prepare for and attend mediation. 2014 WL 1724356 at *12. Defendants argue that here, as in those cases, Rein Law engaged in extensive overbilling surrounding two

United States District Court
For the Northern District of California

alternative dispute resolution events: (i) the June 11, 2010 mediation and (ii) the September 13, 20102 settlement conference.

Three Rein Firm attorneys worked on the 2010 mediation: McGuinness (14.6 hours), Rein (5.5 hours), and Cabalo (7.6 hours).  Defendants credit McGuinness's hours, but argue that Rein and Cabalo should not be paid for their preparation and attendance.  Defendants urge an adoption of the approach in *Delson*, where the court declined to credit Rein's hours after finding that only one attorney was required to prepare for (and attend) mediation:

> Plaintiff has failed to articulate why it was necessary for two attorneys to attend the mediation or why that amount of preparation was necessary for a case that was not complicated, especially for attorneys with extensive experience handling such cases. The Court will therefore subtract the 16 hours Mr. Rein billed for the mediation.

2013 WL 1819265 at *7.  Similarly, in *Hernandez*, the court questioned "the need for both Rein and Cabalo to prepare for and attend the mediation," especially in light of Cabalo's extensive experience.  2014 WL 1724356 at *12.  Here, too, plaintiff does little to explain why *three* attorneys were needed to prepare for this mediation.  Unlike *Delson*, though, this case cannot be fairly classified as "not complicated."[5]  *See* 2013 WL 1819265 at *7.  Moreover, also unlike in *Delson* and *Hernandez*, Rein did not attend the mediation session in this case.  Instead, he billed 5.5 hours for settlement discussions leading up to the event.  As senior counsel, this seems reasonable for such a complex case.  Defendants are correct, however, that Cabalo's hours are not substantiated. Accordingly, consistent with the concerns expressed in both *Delson* and *Hernandez*, the fee award will not include 5 of Cabalo's 7.6 hours spent preparing for and attending the 2010 mediation.

Two attorneys and one paralegal worked on the 2012 settlement conference: Rein (10.3 hours preparation and 6.7 hours attendance), McGuinness (18.5 hours preparation and 4.8 hours attendance), and Clefton (10.3 hours preparation and 7 hours attendance).  In sum, Rein Law spent 39.1 hours preparing for and 18.5 hours attending the six-hour conference, resulting in a request exceeding $25,000 in related fees.  Even assuming it was reasonable for two attorneys to attend the conference, plaintiff makes little attempt to explain why two highly-experienced attorneys and a

---

[5] Similarly, the court in *Hernandez* noted the "lack of legal or factual complexity" in that case. *See* 2014 WL 1724356 at *9.

1  paralegal needed to spend so much time *preparing* for the conference.  Although, as previously

2  noted, this case was more complex than either *Delson* or *Hernandez*, it was still unreasonable for

3  McGuinness—even as lead attorney in this case—to spend 18.5 hours preparing for the event,

4  especially when firm owner Paul Rein spent 10.3 hours of his time doing the same.  Rein's and

5  McGuinness's requests will each be reduced by 6 hours to account for excessive time spent

6  preparing for the settlement conference.  Clefton's time will be reduced by 10 hours.  While this

7  adjustment is not as severe as those imposed in *Hernandez* and *Delson*, it reflects counsel's failure

8  to substantiate the excessive amount of attorney and paralegal time spent preparing for and attending

9  the event.

10                  *vii.*      *Time Spent on Various Motions*

11          Defendants spend pages complaining that plaintiff's counsel spent too much time

12  researching and drafting various motions, including the November 2011 motion for summary

13  judgment (131.4 hours), the March 2012 motion for reconsideration (34.9 hours), the 2013

14  discovery motions (76.9 hours), and the present attorney fees motion (106.7 hours).  In support of

15  this argument, defendants provide figures demonstrating that their attorneys spent much less time on

16  the same or similar motions.  Such comparisons to opposing counsel's litigation practices are not

17  particularly helpful, especially given the ultimate result.  "By and large, the court should defer to the

18  winning lawyer's professional judgment as to how much time he was required to spend on the case;

19  after all, he won, and might not have, had he been more of a slacker."  *Moreno,* 534 F.3d at 1112.

20  Accordingly, even though plaintiff did not prevail on all the motions mentioned above, defendants

21  fail to provide a good reason to question the facial reasonableness of the time spent on those

22  motions.

23          There is, however, one exception—the present motion for attorney fees, for which Rein Law

24  enlisted three attorneys and two paralegals for a total of 123.5 hours of work: McGuinness (72.3

25  hours), Rein (8.9 hours), Cabalo (1.1 hours), Clefton (40.9 hours), and Jaramillo (.3 hours).[6]  Rein

26  Law files attorney fee motions in this district quite often.  In several recent cases, other courts in this

27

28  _____
    [6] In addition to the 62.8 hours requested in plaintiff's initial motion, McGuinness requests 43.9
    hours for work she conducted after the motion was filed.

district have found that despite the firm's close familiarity with the issues and procedures recurring in attorney fee motions arising from disability access litigation, Rein Law frequently requests unreasonably high fees for time spent on such motions.  In *Cruz*, the court imposed a 50% reduction on Rein Law's request for 30.8 hours of compensation for fee motion work.  2013 WL 2447862 at *8.  In *Hernandez*, where the firm spent 29.2 hours preparing its fee motion, the court imposed a more severe reduction—over 60%—after providing a thorough summary of the systemic excesses reflected year after year in Rein Law's requests for "fees-on-fees."  2014 WL 1724356 at *13-14.  In the reply, plaintiff's counsel explain that of the 62.8 hours initially requested in the motion, only 31.4 were spent preparing it—the remaining post-judgment work reportedly "went to negotiating, client contacts, and defendants' notice of appeal."  (Pl. Repl., ECF No. 282, 8:15-16).  If this is so, it was somewhat disingenuous for plaintiff in his opening brief to refer repeatedly to the 62.8 hours of post-judgment work as being spent on attorney fees.  *See id.* at 19:19 (requesting "fees on fees" for 62.8 hours of work) and 20:19-20 ("Fees on fees, February 11 - March 4, 2014," totaling $26,690).  Plaintiff's motion makes no mention of time spent on defendants' appeal, nor does plaintiff offer authority for the notion that such time would be compensable as "time spent by counsel in establishing the right to a fee award."  *See Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992) *opinion vacated in part on denial of reh'g*, 984 F.2d 345 (9th Cir. 1993).  In accord with the concerns expressed in *Cruz* and *Hernandez*, and in light of the vague and incomplete nature of the fee motion's initial request for "fees on fees," 20 hours of McGuinness's time and 5 hours of Rein's time will be reduced from plaintiff's request for post-judgment work.

In light of these discrete reductions for excessive, redundant, or otherwise unsubstantiated entries, the lodestar is calculated based on the following hours:

| | Hours Billed | Hours Reduced | Hours Assessed | Rate | Lodestar Fees |
|---|---|---|---|---|---|
| Paul Rein | 153.6 | 35.4 | 118.2 | 645/hr | $72,239 |
| McGuinness (2009-2013) | 1,043.8 | 6 | 1037.8 | 495/hr | $513,711 |
| McGuiness (2014) | 79.6 | 20 | 59.6 | 550/hr | $32,780 |
| Catherine Cabalo | 80.3 | 11.1 | 69.2 | 425/hr | $29,410 |

United States District Court
For the Northern District of California

| Aaron Clefton | 452.9 | 10 | 442.9 | 175/hr | $77,507.50 |
| Holly Jamarillo | 39.7 | 0 | 39.7 | 135/hr | $5,359.50 |
| **TOTAL** | | | | | $731,007 |

C.  Lodestar Adjustment

Both parties request an adjustment to the lodestar, albeit in different directions and under different legal authority.  Plaintiff, invoking the state law "multiplier," seeks to increase the unadorned lodestar award by 50%.  Defendants, looking to federal law, contend the lodestar figure should be reduced due to plaintiff's only partial success in this case.

i.    *Plaintiff' Request for Multiplier*

Unlike federal law, the CDPA and Unruh Act allows a lodestar "multiplier" when the litigation "involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).  The party seeking a fee enhancement under state law bears the burden of proving the multiplier is warranted. *Id.* at 1138.  When a plaintiff in federal court prevails under both federal and state law, the district court "may apply the more generous provisions of state law in calculating a fee award, such as including a multiplier for contingent fee risk." *Fair Hous. Council of San Diego v. Penasquitos Casablanca Owner's Ass'n*, 523 F. Supp. 2d 1164, 1170 (S.D. Cal. 2007), *rev'd on other grounds and vacated sub nom. The Fair Hous. Council of San Diego, Joann Reed v. Penasquitos Casablanca Owner's Ass'n*, 381 F. App'x 674 (9th Cir. 2010).

According to plaintiff, this is the sort of "rare and exceptional" case warranting a fee enhancement under California law.  *See Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 n. 4 (9th Cir. 2000) (citation omitted).  In particular, Rein Law notes that it took on a "legally risky" case, litigated it on a contingent fee basis for nearly five years, and "ultimately achieved all the remedies [plaintiff] sought."  (Pl. Mot., ECF No. 260, 13:9-10).  Indeed, these are the sort of factors that could support a fee enhancement under California law.[7]  In *Ketchum*, the California Supreme Court

---

[7] As discussed below, however, plaintiff did *not* achieve all of the injunctive relief he sought.  (*See* Pl.'s Post-Trial Proposed Findings of Fact, ECF No. 247, 23) (seeking injunctive relief for deficient maneuvering space at door landing, excessive stair riser height, lack of uniformity in stair risers, incomplete stair handrails, non-accessible gripping surface, lack of stair striping, excessive ramp

United States District Court

For the Northern District of California

explained that when considering whether to apply a multiplier, "the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." 24 Cal. 4th at 1132.  Rein Law undertook a contingent risk in litigating this case for five years without the promise of payment.  Moreover, the firm displayed legal skill in securing a victory to vindicate Rodriguez's statutory civil rights.  *Ketchum* emphasized, however, that a court should *not* consider contingent risk or exceptional skill "to the extent [these factors] are already encompassed within the lodestar."  *Id.* at 1138.  The court warned that where an attorney's extraordinary skill is already reflected in her hourly rate, a skill-based enhancement would result in unfair double-counting:

> [F]or the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar.  A more difficult legal question typically requires more attorney hours, and a more skillful experienced attorney will command a higher hourly rate. . . . Thus, a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation.

*Id.* at 1138-39.  In the same respect, where the relevant legal market already compensates for contingency risk, it would be inappropriate to enhance a fee award based on the contingent nature of the underlying case.  *See id.* at 1138 (the court "should also consider the degree to which the relevant market compensates for contingency risk").  Here, plaintiff's counsel are being compensated at substantial hourly rates that are based on, among other things, the approximate market price for disability access attorneys of similar skill and experience in the Bay Area.  For McGuinness, Rein, and their peers, contingency arrangements are a normal feature of representing plaintiffs in disability access cases.  Presumably, therefore, the often-contingent nature of disability access work is priced into these attorneys' market rates.

In short, no fee enhancement is warranted here, where the skill of counsel, the difficulty and novelty of the underlying legal issues, and the contingent nature of the fee award are already baked

slope, excessive cross slope, lack of accessible ramp landing, lack of ramp handrails, lack of ramp edge protection).  Nor did he obtain treble damages.  *See id.* at 26-27.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    into the unadorned lodestar.[8]  Counsel's skill is evidenced by its sizeable hourly rates.  The

2    difficulty and novelty of the underlying legal issues are reflected in the significant number of hours

3    logged over the course of this litigation, and in the skill (and thus the rate) of the attorneys working

4    on plaintiff's behalf.  The lodestar also accounts for the contingent nature of this case by, among

5    other things, awarding fees based on counsel's current, or at least very recent, hourly rates, thereby

6    accounting for the lengthy delay in payment.[9]  Although Rein Law undertook a risk in litigating this

7    complex case from start to finish, and while the firm achieved a result that benefits both its client

8    and the general public, the lodestar already reflects these considerations.[10]

9                          *ii.     Defendant's Request for Reduction*

10           Defendants also request a lodestar adjustment, but in the opposite direction, arguing plaintiff

11   only achieved partial success on his claims.  Where a prevailing party achieves limited success, "the

12   product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate

13   may be an excessive amount."  *Hensley*, 461 U.S. at 436.  In such circumstances, the court has

14   discretion to lower the fee award.  "There is no precise rule or formula for making these

15   determinations.  The district court may attempt to identify specific hours that should be eliminated,

16   or it may simply reduce the award to account for the limited success."  *Id.*  In the wake of *Hensley*,

17   the Ninth Circuit has instructed district courts to undertake a two-step process when adjusting fees

18   to account for partial success:

19   _____

20   [8] In addition to these factors, *Ketchum* held that a court may adjust the lodestar based on "the extent
     to which the nature of the litigation precluded other employment by the attorneys."  24 Cal. 4th at
21   1132 (citing *Serrano v. Priest*, 20 Cal. 3d 25 (1977)).  To be sure, counsel's work on this case
     necessarily limited the time they could work on other matters, but the same can be said for any other
22   contingent disability access case.  While Rein Law spent *much* more time on this case than it did on
     others, this is already reflected in the lodestar, which awards fees based on the high number of hours
23   logged by plaintiff's counsel.

24   [9] *See Ketchum*, 24 Cal. 4th at 1132 ("The contingent fee compensates the lawyer not only for the
     legal services he renders but for the loan of those services.  The implicit interest rate on such a loan
25   is higher because the risk of default (the loss of the case, which cancels the debt of the client to the
     lawyer) is much higher than that of conventional loans.") (quoting Posner, Economic Analysis of
26   Law (4th ed. 1992) pp. 534, 567).

27   [10] In the same respect, because consideration of the relevant *Kerr* factors was subsumed in the
     lodestar calculation, there is no need to re-evaluate them here or below.  *See Secalt S.A. v. Wuxi*
28   *Shenxi Const. Mach. Co., Ltd.*, 668 F.3d 677, 689 (9th Cir. 2012) (where appropriate, district court
     may adjust the lodestar based on the *Kerr* factors "that have not been subsumed in the lodestar
     calculation").

First, the court asks whether the claims upon which the plaintiff failed to prevail were related to the plaintiff's successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims. If the unsuccessful and successful claims are related, then the court must apply the second part of the analysis, in which the court evaluates the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." If the plaintiff obtained "excellent results," full compensation may be appropriate, but if only "partial or limited success" was obtained, full compensation may be excessive. Such decisions are within the district court's discretion.

*Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986) (quoting *Hensley*, 461 U.S. at 434-35).

Of the numerous barriers plaintiff challenged at trial, he obtained injunctive relief as to three—the inaccessible restaurant entrance and the two "restroom barriers."[11] (*See* Findings of Fact and Conclusions of Law, ECF No. 250, 34). The parties further stipulated that at least a dozen other barriers existed at the time of his 2008 visit, thereby triggering violations of the CDPA and Unruh Act.[12] Rodriguez did not succeed, however, in challenging various other barriers. The post-trial order held that plaintiff lacked standing to challenge certain barriers pertaining to the safety of the restaurant's entrance stairway. The order further refused to consider plaintiff's claims concerning numerous other barriers that were not identified until April 2013. Accordingly, plaintiff achieved only partial success in this litigation. Although he obtained injunctive relief pertaining to three barriers and won $12,000 in damages under state law, he failed to obtain any relief pertaining to the alleged stairway safety barriers or the April 2013 barriers.

Under the first *Thorne* step, plaintiff's successful and unsuccessful claims are related. "[R]elated claims involve a common core of facts *or* are based on related legal theories." *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003) (emphasis in original).[13] Unrelated claims, by contrast,

---

[11] There is some disagreement, or at least a lack of clarity, surrounding the "number" of barriers plaintiff challenged at trial. By defendants' count, only thirteen barriers were disputed at the trial phase. Plaintiff's trial briefing, however, indicates he sought injunctive relief for more than twenty barriers, despite the parties' stipulation that several had already been remediated. (*See* ECF No. 247, 23). In any event, it is not necessary to identify the exact number of barriers challenged, remediated, won, or lost.

[12] Defendants remediated many barriers, thereby mooting the possibility of relief under the ADA.

[13] *See also Hawkins v. Berkeley Unified Sch. Dist.,* 250 F.R.D. 459, 466 (N.D. Cal. 2008) (describing the *Webb* formulation as a "liberal" application of *Hensley's* relatedness test).

United States District Court

For the Northern District of California

"will be 'distinctly different,' and based on different facts and legal theories." *Thorne*, 802 F.2d at

1141 (quoting *Hensley*, 461 U.S. at 434).  Plaintiff's winning and losing claims are united by a

common set of related legal theories under federal and state disability access law.  Although each

barrier was alleged to be in violation of different provisions of federal and state disability access

*regulations*, plaintiff's various challenges proceeded under the same overarching statutory theories

of liability.[14]  Because Rodriguez's various barrier challenges were not "based on different facts *and*

legal theories," *see Thorne*, 802 F.2d at 1141 (emphasis added), his successful and unsuccessful

claims are related.[15]

Because the successful and unsuccessful claims are related, "the district court must focus on

whether the hours spent in litigation were reasonably necessary to obtain the relief that was

ultimately obtained."  *Velez v. Wynne*, 220 F. App'x 512, 513 (9th Cir. 2007).  All three of

plaintiff's successful ADA claims were raised in his initial complaint.  (ECF No. 1).  The same

claims also triggered compensatory damages under the CDPA and the Unruh Act.  The amended

complaint, by contrast, included various claims that were ultimately unsuccessful.  Moreover,

although the amended complaint introduced barriers that were ultimately found to be in violation of

state law, those barriers did not affect plaintiff's monetary award.  (*See* ECF No. 250, 34:16)

---

[14] Some other courts have applied the relatedness inquiry in a more stringent manner, finding that claims regarding separate disability access barriers at the same property are unrelated.  *See Garcia v. Tariq*, 2007 WL 2492614 (E.D. Cal. Aug. 30, 2007) (claims regarding various barriers at subject property were unrelated because each barrier claim was premised on a different section of federal access guidelines); *White v. Save Mart Supermarkets*, 2005 WL 2675040 (E.D. Cal. Oct. 20, 2005) (same).  Those cases do not adequately embrace the Ninth Circuit's "liberal[]" approach to the *Hensley* "relatedness" test.  *See Hawkins*, 250 F.R.D. at 466.  In *Save Mart*, after finding the prevailing plaintiff's ADA claims "unrelated," the court proceeded to conclude it was "impossible" to apportion fees between the successful and unsuccessful claims.  2005 WL 2675040 at *4.  The court accordingly reduced the plaintiff's award by 20% to account for his limited success.  This result would not be out-of-place under a "related claims" framework, where courts may impose broad percentile-based reductions due the intractability of related successful and unsuccessful claims.  *See Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002) (affirming 30% fee reduction where successful and unsuccessful claims were related).

[15] It is less clear that all of his claims arise from a "common core of facts."  *See Thorne*, 802 F.2d at 1141.  Although Rodriguez's claims all sought to remove barriers from the same small restaurant, the April 2013 barriers arguably arose from a course of conduct—defendants' post-complaint modifications—that was "distinct and separate" from the actions creating the barriers in existence at the time of plaintiff's November 2008 visit.  *See id.*  In any event, for purposes of assessing relatedness, it is enough that his claims were based on related legal theories.

1  ("[D]efendants' cumulative violations of the CDPA and the Unruh Act do not compound

2  Rodriguez's statutory minimum damages.")  Nor did plaintiff gain anything from his attempt to

3  challenge the April 2013 barriers in this lawsuit.[16]  In other words, had plaintiff proceeded at trial

4  under the allegations in his initial complaint, he would have ultimately obtained the same relief.

5           Although it is not possible to parse out the specific time spent on plaintiff's unsuccessful

6  allegations, several pieces of this litigation can be attributed in part to the pursuit of those claims.

7  Plaintiff did not attempt to amend his complaint until discovery had closed and motions for

8  summary judgment had been adjudicated, so defendants opposed plaintiff's late amendment,

9  prompting motion practice.  After leave to amend was granted, discovery was reopened.  New

10  discovery disputes arose, prompting plaintiff to file a motion to compel.[17]  Accordingly, beginning

11  with plaintiff's November 2012 motion for leave to amend, a sizeable portion of the parties' pretrial

12  motion practice flowed from plaintiff's choice to pursue claims that were ultimately irrelevant to his

13  post-trial relief or were wholly unsuccessful.  Further, while the April 2013 barriers did not trigger

14  any additional motions, the parties devoted a significant portion of trial argument and trial briefing

15  to litigating those barriers, which ultimately had no place in this case.  Because Rodriguez could

16  have achieved the same result without pursuing many of these barriers, a significant amount of time

17  spent on this case was not "reasonably necessary to obtain the relief that was ultimately obtained."

18  *See Velez,* 220 F. App'x at 513.

19           At the same time, Rodriguez's limited success must be viewed in light of the benefit he

20  obtained for other disabled individuals.  "In setting a reasonable fee award . . . [a] district court

21  should consider whether, and to what extent, [the plaintiff's] suit benefitted the public."  *McCown v.*

22  *City of Fontana*, 565 F.3d 1097, 1105 (9th Cir. 2009).  This case brought about remediation and

23  injunctive relief that will benefit La Victoria customers for years to come.  Rodriguez's suit may

24  also encourage other business owners in the community to ensure that their public accommodations

25  are compliant with federal and state disability access law.  Even considering these achievements,

26  ─────────────────────────
   [16] As explained in the post-trial order, plaintiff had no basis to litigate numerous barriers that were
27  not identified in his amended complaint and that did not exist at the time of his alleged injury.

   [17] *See* ECF No. 197.  Plaintiffs filed another motion to compel (ECF No. 168) and motion for
28  sanctions (ECF No. 194) unrelated to the newly-identified barriers.

however, the results were not sufficiently "excellent" to warrant full payment according to the lodestar. *See Hensley*, 461 U.S. at 435 (full award is warranted despite partial success where plaintiff obtained "excellent" results). While a plaintiff need not obtain *all* requested relief in order to achieve excellent results, *see Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005), there is too great a mismatch between the results obtained and the relief sought to warrant a full award here, where a significant chunk of the litigation flowed from plaintiff's unsuccessful attempt to remedy certain other barriers.[18]

In light of the limits on plaintiff's success, but taking into account the public benefit achieved by his case, a 20% lodestar reduction is warranted. This adjustment reflects that while the enormous time spent on this litigation was in some respects out of proportion to the results ultimately obtained, counsel nonetheless achieved significant success for their client and the public. If a district court has discretion to impose an across-the-board ten percent fee "haircut" with little to no explanation, *Moreno v. City of Sacramento*, 534 F.3d at 1112, even where the plaintiff achieves "excellent" results, *id.* at 1114, it is reasonable here to reduce plaintiff's overall fees by twenty percent, after accounting for the discrete lodestar reductions identified above, due to the constraints on plaintiff's overall success.[19] Accordingly, the lodestar amount ($731,007) is reduced to $584,805.60.

---

[18] *Cf. Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001) (awarding full fees despite failure of certain claims where the plaintiff's class action suit brought about widespread improvement of Oregon's disability determination system); *Rauda v. City of Los Angeles*, 2010 WL 5375958 at *4 n. 4 (C.D. Cal. Dec. 20, 2010) (awarding full fees where plaintiffs lost some claims on summary judgment, prevailed on all claims at trial, and ultimately brought about "significant policy changes" within the defendant police department).

[19] When an adjustment for partial success is warranted, the Ninth Circuit prefers the district court reduce the hours claimed and the rate sought instead of adjusting the overall lodestar. *See Corder v. Gates*, 947 F.2d 374, 378 (9th Cir. 1991) ("Since consideration of limited success is presumably subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate, district courts should not ordinarily make a separate adjustment for limited success.") (citation and quotation marks omitted). Although a separate lodestar reduction for limited success is generally "disfavored," such an adjustment is permissible so long as the court "partition[s] its 'lodestar' analysis from consideration of . . . degree of success" and "account[s] for . . . limited success only once." *See id.* Here, the unadjusted lodestar does not account for plaintiff's limited success. Although a modest portion of counsel's hours were omitted from the lodestar calculation, those deductions were entirely unrelated to Rodriguez's success. Accordingly, this separate lodestar adjustment raises no risk of double-counting. *See Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1465 (9th Cir. 1988) *cert. granted, judgment vacated*, 490 U.S. 1087 (1989) *and opinion reinstated*, 886 F.2d 235 (9th Cir. 1989) ("Mathematically, it is inconsequential whether the lodestar figure

D. <u>Costs and Litigation Expenses</u>

Plaintiff further requests $248,671.84 in costs and litigation expenses.[20]  Defendants contend, however, that plaintiff's request has already been adjudicated.  Prior to filing this motion, plaintiff lodged a $251,789.91 bill of costs with the Clerk.  (ECF No. 258).  The bill included requests for both taxable costs and non-taxable litigation expenses.  Defendants filed an objection arguing, among other things, that plaintiff's bill of costs included mostly non-taxable items.  (ECF No. 268).  The Clerk, who is empowered only to assess taxable costs, entered an order taxing costs at $17,991.74.  (ECF No. 273).  Instead of seeking review of the Clerk's decision with an appeal to this court, plaintiff used this motion—which was filed after the bill was lodged, but before the Clerk's decision had been rendered—to ask for the *same* costs and litigation expenses.[21]  Had plaintiff wished to seek review of the Clerk's decision, he was required to do so within seven days. *See* Fed. R. Civ. P. 54(d)(1).  Defendants now argue that while the ADA allows prevailing litigants to seek reasonable litigation expenses, *see* 42 U.S.C. § 12205, Rodriguez's unsuccessful attempt to seek those expenses from the Clerk, followed by his failure to appeal the Clerk's decision in a timely fashion, precludes him from now requesting those same costs and expenses in this motion.

Plaintiff's approach to seeking costs and expenses is puzzling.  If counsel knew the Clerk would only approve taxable costs, it is unclear why plaintiff's bill of costs included so many expenses that are plainly not taxable under Civil Local Rule 54.  At the hearing on this motion, plaintiff's counsel explained that she had taken a "belt and suspenders" approach by seeking all costs and expenses from the court and the Clerk alike.  If counsel had taken all prudent precautions, however, she would have also sought review of the Clerk's decision in a timely fashion, thereby precluding defendants from making the reasonable argument that Rodriguez procedurally defaulted

---

itself is adjusted for lack of success or whether the reasonable hours component of the lodestar is adjusted for lack of success. What matters is that the district court did not 'count' for lack of success twice.").

[20] More specifically, plaintiff seeks reimbursement for fees relating to filing ($350), service ($4,300.77), transcripts ($15,504.01), printing  ($944.80), witnesses ($197,594.38), copies ($11,690.75), and miscellaneous "[o]ther costs" ($18,287.13).  (Steven Rein Decl., ECF No. 285, 4:10).

[21] Accounting for costs already taxed, and making a few additional deductions, plaintiff now seeks $230,860.10 in this motion.  (*See* Pl. Repl. 20:10).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   on his request for non-taxable costs and litigation expenses.[22]  More appropriately, plaintiff should

2   not have sought non-taxable expenses from the Clerk in the first place.  *See Pierce v. Cnty. of*

3   *Orange*, 905 F. Supp. 2d 1017, 1046 (C.D. Cal. 2012) ("Plaintiffs' application to tax costs was

4   initially filed with the Court Clerk . . . while their request for non-taxable costs was properly filed

5   with this Court as part of their fees motions.").

6         Fortunately for plaintiff, the timeliness requirements of Rule 54(d) are "not jurisdictional."

7   *U.S., ex rel. Meyer v. Horizon Health Corp.*, 2007 WL 518607 (N.D. Cal. Feb. 13, 2007).  Just as a

8   court has discretion to consider an untimely motion for costs, *Walker v. California*, 200 F.3d 624,

9   626 (9th Cir. 1999), it also may review an untimely appeal of the Clerk's assessment.[23]  Because the

10   ADA permits prevailing plaintiffs to recover out-of-pocket litigation expenses, and because there is

11   no indication that defendants would be prejudiced by a resolution on the merits, Rodriguez's request

12   for litigation expenses will be considered despite this procedural detour.

13           *i.*     *Witness Fees*

14         The majority of plaintiff's claimed expenses—$197,976.11—is attributable to witness fees.

15   Of that amount, more than half—$111,133.82—went to Jonathan Adler, a disability access expert

16   for Access Compliance Services.  Defendants object that Adler spent a significant amount of time

17

---

18   [22] Plaintiff argues the ADA provides an absolute entitlement to costs and expenses, and that the

19   statute "prevails" over Federal Rule of Civil Procedure 54.  This argument is wrong on several points.  Plaintiff invokes 42 U.S.C. § 12205, but the text of that provision makes clear that costs and expenses are far from absolute.  They are allowable at the court's discretion:

20        In any action or administrative proceeding commenced pursuant to this chapter, the
        court or agency, *in its discretion*, may allow the prevailing party, other than the

21        United States, a reasonable attorney's fee, including litigation expenses, and costs[.]

22   42 U.S.C. § 12205 (emphasis added).  Moreover, even if his right to costs under the statute were

23   absolute, plaintiff is wrong to argue that the statute trumps the Federal Rules of Civil Procedure in this instance.  He relies on *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182 (9th Cir. 2001), wherein the Ninth Circuit held that "[w]hen the federal statute forming the basis for the action has an express

24   provision governing costs . . . that provision controls over the federal rules."  *Id.* at 1190.  The circumstances in *Brown* are distinguishable.  There, the district judge denied the prevailing plaintiff

25   costs without offering any explanation whatsoever.  At the time, Rule 54 (which has since been amended) stated that costs are due "as of course to the prevailing party unless the court otherwise

26   directs."  *Id.*  The Ninth Circuit held that this language did not vest the judge with discretion to deny costs, without explanation, where the statute provides otherwise.  It remanded to the district court

27   with orders to consider the plaintiff's request for costs.

28   [23] Although plaintiff filed no "appeal," his reply brief requests the court award various costs and fees not taxed by the Clerk.

United States District Court

For the Northern District of California

performing "duplicative legal work."  (Def. Objections, ECF No. 268, 8:26).  Indeed, Adler logged

many hours researching relevant statutes and regulations and assisting Rein Law in crafting its

briefing and trial strategy.  Defendants fail to explain, however, why this is impermissible as a

categorical matter.[24]  While Adler is not an attorney, his particular type of consulting work requires

familiarity with applicable federal and state regulations and statutes.  Adler's legal knowledge,

combined with his architectural expertise, allows him to offer expert opinion on disability access

compliance.  To the extent any of his work could have been performed by an attorney, defendants

surely would not prefer to pay Cabalo, McGuinness, or Rein—all of whom charge much more than

Adler's current rate of $250/hour—for the same tasks.  Accordingly, plaintiff's recoverable

expenses will not be reduced on this basis.[25]

        Numerous of Adler's other entries, however, are more troubling.  First, he charged

unreasonably high fees for time spent testifying at trial.  Although Adler's normal rate is $250/hour,

he requests a $2,000/day "Court appearance minimum fee" for trial testimony.  If trial lasted seven

or eight hours per day, and if Adler sat through each day in full, this might make some sense.  On

the three days Adler charged this fee, however, trial lasted approximately three hours.  *See* ECF

Nos. 234, 235, 239.  He therefore seeks $6,000 in "minimum" fees for time spent watching, or

testifying in, nine hours of court proceedings.  As if that were not enough, Adler seeks an additional

ten hours of fees (at his normal rate of $250/hour) for time spent on those same days preparing for

cross-examination and reviewing the testimony of defendants' expert witness.[26]  He *also* seeks

_____

[24] In support, defendants offer a passing citation—without any accompanying argument— to *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1367 (N.D. Cal. 1996), where the court reduced expert fees after determining that "some of the [expert] services involved legal consulting, a function for which counsel was retained."  *Id.* at 1367.  Although the court in *Media Vision* concluded that the prevailing party in that partially-settled case "should not be allowed reimbursement for retaining experts whose services, in some instances, duplicate the work assigned to counsel," the court's order did not explain why those experts' law-related work was unreasonable.  *See id.  Media Vision* is of little help to defendants, who make no attempt to explain why this isolated language from another district court fee order should control the result here.

[25] The same goes for defendants' objections to fees from NJP Consulting, a company offering witness preparation services.  As plaintiff notes, hiring a trial consulting company was more affordable than tasking an attorney with witness preparation.

[26] In one especially troubling entry, Adler requests four hours' compensation for "[a]ttend[ing] trial and observ[ing] testimonies" on 10/21/13, a day when he also seeks his $2,000 minimum fee for attending trial.  This certainly conjures the specter of duplicative billing practices.

United States District Court

For the Northern District of California

sixteen hours in fees for other advising, analysis, and consultation surrounding trial, including nine hours for trial "attend[ance]," "observ[ation]," and "feedback" on a day when he did not testify at all.  Altogether, but *still* excluding other fees sought for travel time, lodging, mileage reimbursements, and a daily "per diem," plaintiff requests a whopping $12,812.50 for Adler's time and advice during the week of the four-day bench trial.  In light of the duplicative and troubling nature of his billing practices, Adler's trial-related fees warrant a significant reduction.  While Jonathan Adler's expertise was important to Rein Law's trial presentation, his billing practices are so excessive that no reviewing court could reasonably accept his present fee request at face value.

Unfortunately for plaintiff, these excesses and inaccuracies raise further questions about the veracity and reasonableness of the other $98,321.32 Adler charged in expert fees.  As defendants point out, Adler—who lives in Santa Cruz—seeks nearly fifty hours at his regular rate for travel time over the course of this litigation.  Given that this case lasted five years and proceeded to trial, it is understandable that Adler needed to travel to make numerous site visits, attend trial, and confer with plaintiff's counsel on various occasions.  Nonetheless, the overall amount he seeks—$11,750 for travel time, *not* counting the mileage reduction he also requests—is excessive.  Although it is appropriate for defendants to pay reasonable expenses for expert travel time, it is unreasonable to expect them to pay an expert's full hourly rate for time he spends sitting in traffic.  (*See* 6/11/10, requesting 4.25 hours in fees for driving from Oakland to Santa Cruz during "Friday traffic").  Nor is it appropriate for defendants to pay $480 for Adler's "lost time" flowing from a cancelled site inspection.  (*See* 3/19/13).  These excessive entries are further indication that, as a general matter, Adler's bills cannot be accepted at face value.  Accordingly, to account for the infirmities in Adler's billing practices while still ensuring that plaintiff receives reasonable reimbursement for Adler's expert services, Adler's expert witness fees are reduced by 25%, leaving $83,350.37 in reasonable litigation expenses.

Defendants further object to the expert fees claimed on behalf of Arnold Lerner ($7,700) and Malcolm Roberts ($22,244.23), neither of whom appeared at trial.  Because neither expert offered testimony at the trial phase, defendants argue their work was not "crucial or indispensable" to the litigation at hand.  *See In re Media Vision*, 913 F. Supp. at 1367.  In *Media Vision*, the court held

United States District Court

For the Northern District of California

that in order to award expert witness fees as litigation expenses to the prevailing party, "the court must find that the expert testimony submitted was 'crucial or indispensable' to the litigation at hand." *Id.* It appears that no court in this district has since used the "crucial or indispensable" formulation to assess the propriety of expert witness fees. Even assuming this standard is applicable here, defendants view it too narrowly. According to plaintiff, both Lerner and Roberts served an important role in the litigation. Lerner, a licensed architect specializing in renovation of historical buildings, was retained to opine on whether installing a wheelchair lift would threaten the historical nature of the subject property. In light of defendants' "historical building" affirmative defense, Lerner's work was crucial to the litigation, even if defendants ultimately chose not to assert that defense at trial. Similarly, Roberts' testimony was rendered unnecessary only because defendants elected to drop a contested issue from their trial argument. Roberts, a forensic accountant, was prepared to offer trial testimony on defendants' financial resources. At trial, defendants stipulated that barrier removal would have been financially readily achievable, thereby obviating the need for Roberts to testify. Only one reduction is warranted for these experts: $750, to account for Roberts' retainer, which was supposed to be reduced from his final invoice. Plaintiff's submissions do not indicate that the retainer was removed from Roberts' fees.

Lastly, defendants dispute the $47,583 in expert witness fees claimed on behalf of Karl Danz, who testified at trial regarding the feasibility of a wheelchair lift. Although plaintiff won injunctive relief requiring the installation of a lift, he did so under state law, not the ADA. Defendants argue, and plaintiff does not dispute, that unlike the ADA, the CDPA and Unruh Act do not provide for out-of-pocket litigation expenses. According to defendants, Rodriguez is therefore precluded from recovering expert costs pertaining to the installation of a wheelchair lift. Not all of Danz's fees, however, are attributable to his work regarding that device. He also prepared an "evidence-based cost estimate for removal of interior barriers in the restroom and restaurant." (Pl. Repl., ECF No. 282, 16:19-20). Although most of the interior barriers were mooted for purposes of plaintiff's ADA claim, Rodriguez succeeded on two restroom barrier ADA claims at trial. Although it appears the majority of Danz's work went towards supporting claims that were successful only under state law, parsing out Danz's billing entries in an attempt to identify the specific work he

United States District Court
For the Northern District of California

1  performed in support of plaintiff's ADA claims is not required.[27]  Instead, as explained below,

2  plaintiff's expenses will be reduced overall to account for his limited success in this matter.

3          ii.      Other Expenses

4          Defendants contend they should not be obligated to pay for all of plaintiff's travel costs,

5  arguing that several such expenses are "not [of the sort] normally charged to a fee paying client."

6  (Def. Objections, ECF No. 268, 14:27).  As a general matter, an abundance of case law counsels

7  otherwise.  *See Davis*, 976 F.2d at 1556; *Oldoerp*, 2014 WL 2621202 at *8 (citing numerous cases

8  in this district noting the "prevailing practice" of passing along attorney travel expenses to client).

9  Defendants point out, however, that of the $2,258.87 plaintiff claims in travel expenses, only

10  $1,510.42 can be substantiated by supporting documentation.  In his reply, plaintiff reduces his cost

11  request to $1,510.42.  Accordingly, no further reduction to plaintiff's travel expenses is warranted.

12          Plaintiff also claims $13,834.93 in Westlaw charges for legal research.  Upon review of

13  plaintiff's argument and supporting declaration, this is entirely reasonable.  So, too, was plaintiff's

14  choice to hire an investigator to perform site surveillance and conduct criminal history research.

15  Similarly, in a case of this scope and duration, defendants are in a poor position to second-guess

16  plaintiff's choice to incur more than $10,000 in copying costs.  A reduction is warranted, however,

17  for plaintiff's deposition video recordings.  Of plaintiff's $17,491.90 in deposition transcript

18  expenses, the Clerk allowed $12,341.93 as taxable costs.  Despite defendants' specific objection that

19  no deposition recordings were used at trial, plaintiff makes no attempt to explain why the remaining

20  costs, apparently attributable to video recording, were warranted.  Accordingly, $5,131.08 is

21  reduced from plaintiff's requested costs.[28]

22          iii.     Partial Success

23          Defendants argue that plaintiff's non-taxable litigation expenses, like his attorney fees,

24  should be reduced to reflect his lack of complete success in this action.  Plaintiff rejects this

25  argument, contending that "[a] prevailing party is entitled to recover all his reasonable costs and

---

26  [27] The same goes for work performed by expert Adler, who spent a significant amount of time
27  working in support of claims that were wholly unsuccessful, or successful only under state law.

    [28] This amount does not incorporate the $18.89 late charge that plaintiff voluntarily abandoned in
28  his revised request for costs and expenses.  (*See* Pl. Repl., ECF No. 282, 18:25).

United States District Court

For the Northern District of California

1   litigations expenses *without qualification*." (Pl. Repl., ECF No. 282, 11:24-25) (emphasis added).

2   In support, plaintiff invokes one statute (42 U.S.C. § 12205), one federal regulation (28 C.F.R. §

3   36.505), and one Federal Rule of Civil Procedure (Rule 54), none of which teach that plaintiff's

4   entitlement to costs and expenses is absolute. As described above, *see* n. 22, the ADA makes clear

5   that costs and expenses are allowable at the court's discretion. *See* 42 U.S.C. § 12205. The federal

6   regulation provides the same. *See* 28 C.F.R. § 36.505. Rule 54, meanwhile, mandates only that

7   costs "should be allowed to the prevailing party" unless a court order, federal statute, or another

8   Federal Rule provides otherwise. Indeed, costs, as they should, have been awarded in this case.

9   (*See* Clerk's Order Taxing Costs, ECF No. 273). Rule 54 says nothing, however, about a prevailing

10   plaintiff being *entitled* to non-taxable expenses.[29] In sum, Rodriguez provides no authority for the

11   notion that he is entitled to prevail on his request "without qualification." (Pl. Repl., 11:25).

12         If a court can properly consider the plaintiff's degree of success when awarding attorney

13   fees, *see Hensley*, 461 U.S. at 436, it may do the same when awarding litigation expenses under fee-

14   shifting statutes like the ADA. *Pierce v. Cnty. of Orange*, 905 F. Supp. 2d 1017, 1048 (C.D. Cal.

15   2012). Indeed, the ADA recognizes that litigation expenses are *part of* a reasonable attorney fee.

16   *See* 42 U.S.C. § 12205 (court has discretion to allow "a reasonable attorney's fee, *including*

17   litigation expenses . . . .") (emphasis added). *See also* 28 C.F.R. § 36.505 (same). Even where fee-

18   shifting statutes do not explicitly mention litigation expenses, the Ninth Circuit has "repeatedly"

19   held that a prevailing plaintiff can recover such expenses, *Grove v. Wells Fargo Fin. California,*

20   *Inc.*, 606 F.3d 577, 580 (9th Cir. 2010), reasoning that non-taxable costs are *part of* a reasonable

21   attorney fee. *See Davis*, 976 F.2d at 1556 ("the courts have long held [that certain non-taxable

22   costs] can be awarded as part of a reasonable attorneys' fee since they are typically charged to

23   paying clients by private attorneys"). Because litigation expenses are included as part of the

24   attorney fee recoverable under the ADA, there is no apparent reason why, as plaintiff suggests here,

25   those expenses should be exempt from the partial success reduction that is available for fees

26

27   [29] The only notable reference to nontaxable expenses comes in Rule 54(d)(2)(A), which provides
     that a request for fees and nontaxable expenses "must be made by motion unless the substantive law
28   requires those fees to be proved at trial as an element of damages."

1  generally.  Under Rodriguez's view, a plaintiff who prevails on one claim but loses on twenty could

2  nonetheless collect litigation expenses underlying *all* claims.  While such a result might be sensible

3  under the right circumstances, it would make little sense if courts were powerless to reduce expenses

4  in order to ensure a fee award commensurate with the relief obtained.  Accordingly, as with

5  plaintiff's reasonable fees, his reasonable litigation expenses are reduced by twenty percent.  After

6  accounting for the discrete reductions imposed above, this reduction brings plaintiff's recoverable

7  out-of-pocket litigation expenses to $155,356.51.[30]

8  IV.   CONCLUSION

9       Plaintiff's motion for fees, costs, and expenses is granted, but he is not entitled to the full

10  amount he seeks.  Defendants shall pay plaintiff $584,805.60 in attorney fees, $17,991.84 in taxable

11  costs assessed by the Clerk, and $155,356.45 in litigation expenses.  In total, plaintiff is entitled to

12  $758,153.89 in fees, costs, and expenses.[31]

13

14       IT IS SO ORDERED.

15  Dated:  7/1/14

16

17  _____
    RICHARD SEEBORG
    UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

---

25  [30] This amount reflects two types of reductions for two different purposes.  The first reduction
26  ($36,664.54) reflects unreasonable, unsubstantiated, or excessive litigation expenses.  This reduction
    is wholly unrelated to the second, percentile-based reduction ($38,839.11, or 20% of the remaining
27  litigation expenses), which instead reflects plaintiff's limited success in this matter.

    [31] The 20% reduction applies only to plaintiff's non-taxable costs and litigation expenses.  The
28  $17,991.84 taxed by the Clerk will not be adjusted.